**UNITED STATES of America**

v.

**Victor Manuel GERENA, et al.**

**No. Cr. H–85–50 (TEC).**

United States District Court, D. Connecticut.

June 3, 1987.

Albert S. Dabrowski, Carmen E. Van Kirk, John A. Danaher, III, Stanley A. Twardy, Jr., U.S. Attys., David D. Buvinger, William J. Corcoran, Trial Attys., U.S. Dept. of Justice, Hartford, Conn., for plaintiff.

Juan R. Acevedo, Hartford, Conn., for Norman Ramirez Talavera.

Harold Meyerson, New York City, for Ivonne Melendez Carrion.

Diane Polan, New Haven, Conn., for Elias Castro Ramos.

James Bergenn, Shipman & Goodwin, Hartford, Conn., for Carlos Ayes-Suarez.

Richard Reeve, Asst. Federal Public Defender, New Haven, Conn., for Isaac Camacho-Negron.

Linda Backiel, Philadelphia, Pa., for Antonio Camacho Negron.

Leonard I. Weinglass, New York City, for Juan E. Segarra-Palmer.

William M. Kunstler, New York City, for Filiberto Ojeda Rios.

Michael Avery, Avery & Friedman, Boston, Mass., for Jorge Farinacci Garcia.

Margaret P. Levy, Hartford, Conn., for Angel Diaz Ruiz.

Michael Deutsch, Chicago, Ill., for Orlando Gonzalez Claudio.

John Williams, New Haven, Conn., for Hilton Fernandez-Diamante.

Ronald L. Kuby, New York City, for Luis Colon Osorio.

Robert J. Maldonado-Rivera, Rio Piedras, P.R., pro se.

Jacob Wieselman, Hartford, Conn., for Luz Berrios-Berrios.

RULING ON THE DEFENDANTS' "STANDING" TO CHALLENGE THE ADMISSABILITY OF EVIDENCE SEIZED AT SUITE 301, 210 PONCE DE LEON AVENUE, PUERTA DE TIERRA; EL CENTRO CONDOMINIUM, SUITE 249, BUILDING I, MUNOZ RIVERA AND LA HIJA DEL CARIBE STREETS, HATO REY; AND COOPERATIVA LOS ROBLES, APARTMENT 1012A, VILLA NEVAREZ, RIO PIEDRAS, PUERTO RICO

CLARIE, Senior District Judge.

The defendants in this case, with the exception of Paul Weinberg, each claim standing to challenge the legality of searches conducted at 1) Suite 301, 210 Ponce de Leon Avenue, Puerta de Tierra, Puerto Rico (hereinafter "Ponce de Leon"); 2) El Centro Condominium, Suite 249, Building 1, Munoz Rivera and La Hija del Caribe Streets, Hato Rey, Puerto Rico (hereinafter "El Centro"); and 3) Cooperativa Los Robles, Apartment 1012A, Rio Piedras, Puerto Rico (hereinafter "Apartment 1012A"). Each defendant, with the exception of Paul Weinberg, claims to have had, at the time of each search, a legitimate, reasonable expectation of privacy in each of these locations. The Court finds, however, 1) that only the defendant Filiberto Ojeda Rios has made out a colorable standing claim with regard to the Ponce de Leon premises;[1] 2) that all of the other defendants have failed to adequately allege the

---

1. The Court finds that defendant Ojeda's allegations with regard to the Ponce de Leon location are sufficient on their face to permit him to further pursue his assertion of standing at a hearing. The defendant, however, has waived his right to this opportunity, and insists on relying solely on his unsubstantiated affidavits to support his claim. The Court finds that these affidavits do not satisfy the defendant's burdens. His standing claim must therefore be denied. *See* discussion in Section D–3 in text, *infra*.

existence of legitimate expectations of privacy in each of the three locations at issue; and 3) that defendant Ojeda Rios has also failed to adequately allege the existence of such an interest with regard to the El Centro condominium and Apartment 1012A.

## Facts

Suite 301, 210 Ponce de Leon Avenue is a two-room "office" located in a multi-story commercial building in a business sector of Puerta de Tierra, Puerto Rico. Government agents searched this location on April 3, 1984 pursuant to a warrant. The El Centro Condominium is likewise a suite of rooms located in a multi-story commercial structure in Hato Rey, Puerto Rico. Apartment 1012A is a multi-room apartment located in a residential building in Rio Piedras, Puerto Rico and is the home of non-defendant Sylvia Mulling Cowert. Government agents searched the apartment, as well as the El Centro condominium pursuant to a warrant on August 30, 1985.

The present indictment charges the defendants with various illegal acts associated with the September 12, 1983 robbery of the Wells Fargo Depot in West Hartford, Connecticut. More specifically, the indictment charges the defendants with, among other things, participation in various conspiracies to commit numerous illegal acts, including the robbery itself, and the transportation of stolen monies across state and national boundaries. The Government represents that it will use items seized at the three locations cited above as part of its case-in-chief. The defendants object to the intended introduction of this evidence, challenging the legality of the searches and seizures on a variety of grounds. The issue raised by the Government and addressed in this ruling is whether the defendants have Fourth Amendment "standing" to challenge the use of this evidence at trial.

## Discussion

### A. The Defendants' Compliance with the Court's Previous Orders

The defendants have filed a number of documents setting out their various standing claims. As permitted by Rule 12(c), the Court originally required all defendants to file their suppression motions by December 22, 1986, stating specifically that "[a]ll defendants shall ... file all remaining substantive motions, including but not limited to motions regarding ... (c) the alleged illegality of certain searches and seizures conducted against the defendants...." *Modified Pretrial Scheduling Order*, signed October 29, 1986, p. 2. Several defendants, both individually and on behalf of various co-defendants, filed motions and memoranda discussing various defendants' privacy interests in the Ponce de Leon, El Centro, and Apartment 1012A locations. These focused largely on the defendants' legal arguments surrounding their "collective" or "corporate" standing theories. For example, with regard to the Ponce de Leon location one defendant filed the following:

> *Defendants do not offer separate documentary proof of the invasion of their rights to privacy at Suite 301.* As noted in the affidavit of counsel, numerous warrants for electronic surveillance and physical searches have been based upon sworn statements by government agents asserting their custody and ownership of organizational files, distribution lists, minutes of meetings, publications and tangible objects. There is nothing in any of the government's sworn documents or testimony to suggest that defendants used this location with anything other than the expectation that they would enjoy the utmost privacy there. The government can hardly now disavow those sworn statements.

*Defendants' Memorandum of Law in Support of Motion to Suppress Evidence*, dated December 22, 1986, p. 19 (emphasis added). Counsel argued in court that the defendants intend to rely on a "corporate" or "collective" standing theory to establish standing for each defendant in the locations at issue. Some defendants, however, also argued that they wished to pursue individual standing claims not encompassed by the defendants' "corporate" theory.

Thus, some defendants submitted more particularized accounts of the nature of his or her specific privacy interest in each location. *See Supplemental Memorandum of Defendant Jorge Farinacci Garcia,* filed December 23, 1986. Others argued that they wished to reserve the right to file such claims in the future in the event that their "corporate" standing theory proved to be unavailing. *See e.g. Defendants' Joint Motion to Reserve Right to Move to Suppress,* filed December 22, 1986 (reservation of right to challenge search of Apartment 1012A).

The Court, 1) wishing to give the defendants the opportunity to more fully present standing claims; 2) recognizing the need for greater clarification of the particular claim(s) of each individual defendant; 3) wishing to resolve the standing issues in a fair and expeditious manner; and 4) seeking to elicit a detailed, particularized factual response from each defendant so as (a) to permit the Government to respond to each defendant's claim and (b) to enable the Court to determine the precise questions at issue and the need for further hearings, signed a supplemental order on January 30, 1987, which directed:

> Due to the important nature of "standing" issues; the interest in clarifying these issues; and the interest in avoiding prolonging the present suppression hearings unnecessarily, each defendant is hereby required to submit specific allegations of "standing" for each and every location and vehicle the physical search of which he or she challenges. Each individual defendant's allegation(s) of "standing", *whether based upon an individual or collective interest* in the location or vehicle searched, must specify the exact nature of the interest(s) upon which the individual defendant's allega-

tion(s) of "standing" is based, including *any and all* factual allegations supporting the individual defendant's "standing" claim.

> *Preliminary Ruling on Defendants' "Standing" to Seek Suppression,* January 30, 1987, p. 2 (emphasis added). The Court allowed the defendants until February 17, 1987 to make their particularized submissions. *Id.* at 2. *See United States v. Purvis,* 544 F.Supp. 68, 69 (S.D.N.Y.1982) (requiring defendants to submit sworn affidavits to enable the Court to gauge the validity of the defendants' arguments and the need for a hearing).

It is clear that the defendants understood that this order required of them to submit individual, detailed allegations with regard to their personal expectations of privacy in the locations at issue. *Transcript of February 5, 1987,* pp. 171–72, 182–83 (remarks of Attorney Avery). It is equally clear that defendants understood that each bears the burden of establishing "that his or her relationship to the premises searched was such that he or she would have a reasonable expectation of privacy there." *Id.* at 142 (remarks of Attorney Avery). In this regard, each defendant has submitted a statement setting forth the specifics of his or her individual claim. To a large extent, these submissions address the extent to which each defendant claims a "corporate" standing interest in the locations at issue. However, at least one defendant filed a particularized, individual, non-corporate claim. *See Supplemental Affidavit in Support of Motion to Suppress,* filed January 29, 1987 (affidavit of Filiberto Ojeda Rios claiming that the Ponce de Leon location was, among other things, his "office"). Nonetheless, most address themselves solely to the collective standing argument.[2]

---

**2.** The defendants' legal argument, made in support of their collective standing theory, may be briefly summarized as follows:

> the case law establishes that, where persons are engaged in organizational business together, *United States v. Brien,* 617 F.2d 299 (1st Cir.1980); *United States v. Allison,* 619 F.2d 1254 (8th Cir.1980); or a joint venture with each other, *United States v. Quinn,* 751 F.2d 980 (9th Cir.1984), *cert. denied as improvi-*

*dently granted* [—— U.S. ——], 106 S.Ct. 61 [88 L.Ed.2d 50] (1986); or have a formalized agreement for maintaining premises, *United States v. Perez,* 689 F.2d 1336 (9th Cir.1982); *United States v. Johns,* 707 F.2d 1093 (9th Cir.1983), *rev'd. on other grounds* [469 U.S. 478], 105 S.Ct. 881 [83 L.Ed.2d 890] (1985); or participated in an arrangement that indicates joint control and supervision of premises, *United States v. Pollock,* 726 F.2d 1456 (9th

As directed by Rule 12(b)(3), motions to suppress evidence must be filed prior to trial. Since proof of standing is an essential element of any motion to suppress on Fourth Amendment grounds, such falls within the purview of the Rule. *United States v. Gomez,* 770 F.2d 251, 253 (1st Cir.1985). The defendants bear the burden of establishing Fourth Amendment standing. *Rawlings v. Kentucky,* 448 U.S. 98, 104, 100 S.Ct. 2556, 2561, 65 L.Ed.2d 633 (1980); *Rakas v. Illinois,* 439 U.S. 128, 131 n. 1, 99 S.Ct. 421, 424 n. 1, 58 L.Ed.2d 387 (1978). The Court, pursuant to Rule 12(c) set two unambiguous deadlines, and now considers the defendants' two sets of submissions to be a complete filing of their respective standing claims. *See United States v. Gomez,* 770 F.2d at 253 (the defendants must bear the loss of any failure to present timely standing submissions where they have been afforded ample opportunity to prepare and present their Fourth Amendment claims).

**B. The Ponce de Leon "Office", the El Centro Condominium, and Apartment 1012A**

■ The Government represents that the defendants used the Ponce de Leon location as a "safehouse." The Government offers the following explanation of this term:

> [t]he groups which have historically engaged in terrorism have relied on safehouses as bases of operation in the United States and Puerto Rico. The term "safehouse" is applied by law enforcement in terrorism investigations to apartments, offices and homes utilized by terrorists to meet, plan activities, store weapons, documents, and explosives and hide from law enforcement.

*Affidavit of Joseph L. Reyes,* [filed in support of application for search warrant for Suite 301] p. 13, *as submitted by defendants in Affidavit of Counsel in Support of Motion to Suppress Fruits of Search of Suite 301,* filed [on behalf of all defendants and on behalf of defendant Antonio Camacho Negron] December 22, 1986, exhibit 1. The defendants characterize the location in the following manner:

> [d]efendants ... adopt, for the purposes of this motion, the description of a 'safehouse' as an appropriate characterization of Suite 301. In other words, defendants collectively maintained and used that location as an archive or secure repository for books, records and documents relevant to the struggle for independence, and as a secure meeting place and office in which the identities, addresses and other data about militant idependentistas could be shielded from exposure to the kind of retaliation and repression which has historically been the fate of such people.

*Affidavit of Counsel,* p. 13. Among the evidence listed as seized at the Ponce de Leon location, however, as indicated in an exhibit submitted by the defendants themselves, there is included an "explosive/incendiary device, cylindrical containing a white granular substance and wires attached," [a bomb] "white work gloves," "small box of wires & misc.," "rifle case," "wig," "misc. F.B.I. documents," "make-up kit," "box with disguises," and "box of license plates." *Affidavit of Counsel,* exhibit 1. Despite the defendants' benign

---

Cir.1984); and take reasonable precautions to preserve their privacy, *United States v. Perez, supra, United States v. Quinn, supra, United States v. O'Brien,* [sic] *supra;* they can establish collectively an expectation of privacy in premises searched by the government. The evidence in this case regarding the steps taken by the Macheteros to maintain particularly secure and private locations for conducting meetings and storing documents and other materials clearly bring this case within the parameters of the cited decisions. *Supplemental Memorandum of Defendant Jorge Farinacci Garcia,* [filed on behalf of all defendants] dated February 17, 1987, p. 8. *See also Memorandum of Law in Support of Motion to Suppress Evidence Seized from Calle 21,* filed [on behalf of all defendants and on behalf of defendant Elias Castro Ramos] December 22, 1986, p. 9 ("the co-defendants base their claims to standing on the government's own sworn statements about the nature of the conspiracy, the actions taken by its members to protect the privacy of papers and property, and the collective use of members' homes as meeting places and hiding places for contraband and other property belonging to the conspiracy").

characterization of the location as an "archive,"[3] there is no doubt but that the premises truly served as a base from which the defendants conducted their alleged terrorist activities.[4]

The Government claims that the El Centro condominium and Apartment 1012A were also safehouses. The defendants prefer to characterize the condominium as an organizational "office," and Apartment 1012A as a organizational "suboffice" of the El Centro location.[5] The defendants, however, do not offer an independent basis for their characterizations.[6] Indeed, the defendants insist on their "right" to rely on the Government's averments to establish their entitlement to standing,[7] and, in fact, do rely on the Government's characterization of these two locations as safehouses.[8] The Court finds that the Government's characterizations are firmly supported by a number of evidentiary materials submitted during the course of the present suppression hearings. The Court therefore finds that the Government's characterization of the condominium and the

---

**3.** The defendants themselves contradict their benign definition of "safehouse." *Compare Affidavit of Counsel in Support of Motion to Suppress Fruits of Search at Suite 301,* [filed on behalf of all defendants and on behalf of defendant Antonio Camacho Negron] dated December 22, 1986, p. 13 (defining safehouse as archives), *with Affidavit in Support of Motion to Suppress Physical Evidence,* filed [on behalf of defendant Antonio Camacho Negron] February 17, 1987, p. 4 (relying on the Government's definition of safehouse to establish defendant's membership in the organization: " 'the term "safehouse" is applied by law enforcement in terrorism investigations to [places] utilized ... to meet, plan activities, store weapons, documents and explosives and hide from law enforcement. ... Safehouses are used principally for the business of the organization and not for social or personal purposes ...' "). The misleading character of the defendants' benign characterization is thinly veiled. The location clearly did not serve as a residence or office in any traditional sense.

**4.** Some defendants claim that they also used the premises for legitimate political purposes. *See e.g. Affidavit Regarding Standing of Defendant Isaac Camacho-Negron,* filed February 17, 1987, p. 3 (alleging that "[t]he activities allegedly conducted by Los Macheteros include legal, protected political activity"); *Affidavit in Support of Motions to Suppress,* filed [on behalf of defendant Antonio Camacho Negron] February 17, 1987, p. 3 (alleging that "[t]he documents recovered at the locations described above reflected lawful, protected political activity by the organization and its individual members as well as illegal acts undertaken in pursuit of the independence for Puerto Rico"). These allegations, however, are entirely unsubstantiated. *See* text accompanying note 41, *infra.*

The Court agrees with the Government's characterization of the Ponce de Leon location as a safehouse. The extensive record established thus far in the many months of hearings overwhelmingly supports the conclusion that this location was used as a workshop for, among other things, the preparation of explosive/incendiary devices; and that it also served as a storage facility for weapons and organizational records which document the defendants' illegitimate terrorist endeavors. The location may also have served as a hideout and as a meeting place used to plan criminal activities. Properly characterized, the location falls squarely within the Government's definition of the term safehouse. It was neither a legitimate office or residence in any normal sense, nor was it used for personal purposes. This perhaps accounts for some of the difficulty the defendants have in alleging the existence of reasonable expectations of privacy with regard to this location. By its nature, the location is unlike an office or home. The Court does not mean to say, however, that safehouses are, by their nature, incapable of sheltering reasonable expectations of privacy under appropriate circumstances. *See* note 21, *infra.*

For a definition of "terrorism" see 50 U.S.C. sec. 1801(c). *See also United States v. Duggan,* 743 F.2d 59, 71 (2d Cir.1984) (upholding the constitutionality of this section).

**5.** *See e.g. Affidavit Regarding Standing of Defendant Isaac Camacho-Negron,* filed February 17, 1987, p. 5.

**6.** *See e.g. Affidavit Regarding "Standing" of Defendant Elias Castro Ramos,* dated February 16, 1987, pp. 4–5 (relying on the Government's characterizations to support his claims that Apartment 1012A was a suboffice of the El Centro safehouse).

**7.** *See e.g. Supplemental Memorandum of Defendant Jorge Farinacci Garcia,* filed December 22, 1986, pp. 13–27; *Supplemental Memorandum of Defendant Jorge Farinacci Garcia,* dated February 17, 1987, pp. 2–7; *Consolidated Memorandum in Support of Motion to Suppress,* filed [on behalf of all defendants and on behalf of defendant Orlando Gonzales Claudio] December 22, 1986, pp. 9–13.

**8.** *See e.g. Affidavit Regarding Filiberto Ojeda's "Standing" to Suppress Evidence Obtained from Various Premises,* filed February 17, 1987, p. 3 ("[d]efendant relies upon the Government's allegations with respect to [the El Centro condominium] being a 'safehouse' ").

apartment as safehouses is indeed accurate for the Court's present purposes.

With these preliminary characterizations in place, the Court now turns to consideration of the particulars of the defendants' standing claims, beginning with a discussion of the content of their allegations, and then proceeding to a discussion of the scope of the defendants' assertions and the factual framework within which they are made.

### 1. The Defendants' Affidavits and Memoranda

Each defendant relies on the following averments made by the Government in various contexts to support his or her standing claim: 1) that he or she was a member of the militant organization known as "Los Macheteros" ["the Machete wielders"]; 2) that Los Macheteros was a highly secret, clandestine organization; 3) that each member, as a condition of membership, conducted him or herself in a manner designed to preserve anonymity and secrecy; 4) that Los Macheteros used the Ponce de Leon, El Centro, and Apartment 1012A locations to conduct secret organizational activities, and as storage facilities in which to maintain highly secret (and ultimately incriminating) records and other "materials"; and 5) that access to these locations was strictly limited.[9] For the purposes of the present mo-

---

**9.** *See e.g. Affidavit Regarding the Standing of Defendant Norman Ramirez Talavera,* filed February 20, 1987, pp. 3–4; *Affidavit Regarding Standing of Defendant Ivonne Melendez-Carrion,* filed February 17, 1987, pp. 2–4; *Affidavit Regarding the Standing of Defendant Luz M. Berrios Berrios,* filed February 17, 1987, pp. 4–5.

Certain defendants rely on additional assertions in support of their standing claims:

a) Defendant Norman Ramirez Talavera also relies on the assertion that documents taken from the Ponce de Leon location refer to him by his alleged code name. *Affidavit Regarding the Standing of Defendant Norman Ramirez Talavera,* filed February 20, 1987, p. 4;

b) Defendant Elias Castro Ramos also relies on the Government's assertion that he was a member of the organization's Directive Committee; that he attended a number of meetings with other members of the organization, both before and after the search of the Ponce de Leon premises, at locations other than the locations at issue in this ruling; and that his fingerprints were found on organizational documents seized at the Ponce de Leon location. *Affidavit Regarding "Standing" of Defendant Elias Castro-Ramos,* dated February 16, 1987, pp. 5–6;

c) Defendant Carlos Ayes Suarez also relies on the Government's assertions that his name appears on records seized at the Ponce de Leon safehouse. *Affidavit Regarding Standing of Defendant Carlos M. Ayes-Suarez,* filed February 17, 1987, p. 6;

d) Defendant Isaac Camacho Negron also relies on the Government's averments that he was the alleged treasurer of the organization; that he prepared some of the organization's financial documents seized at the Ponce de Leon safehouse; that his fingerprints appear on documents seized at the El Centro and Ponce de Leon safehouses; and that he prepared some of the financial documents seized at the El Centro safehouse. *Affidavit Regarding Standing of Defendant Isaac Camacho-Negron,* filed February 17, 1987, p. 5;

e) Defendant Antonio Camacho Negron also relies on the Government's assertions that he visited with other members of the organization; and that financial records seized from the El Centro location refer to him by his alleged code name. *Affidavit in Support of Motions to Suppress,* filed [on behalf of defendant Antonio Camacho Negron] February 17, 1987, p. 6;

f) Defendant Juan Segarra Palmer also relies on the Government's assertions that he was a member of the organization's Directive Committee; that his fingerprints were found on documents seized at the Ponce de Leon premises; and that documents seized at the Ponce de Leon location refer to him by his alleged code name. *Affidavit Regarding Standing of Defendant Juan Enrique Segarra Palmer,* filed February 17, 1987, p. 5;

g) Defendant Jorge Farinacci Garcia also relies on the Government's assertions that he was a member of the organization's Directive and Central Committees; and that he was seen at meetings with other members of the organization at a location other than the locations at issue here. *Affidavit Regarding Standing of Defendant Jorge Farinacci Garcia,* filed February 17, 1987, pp. 4–6; *Supplemental Affidavit in support of Standing Claims of the Defendant Jorge Farinacci Garcia,* filed February 24, 1987;

h) Defendant Angel Diaz Ruiz also relies on the Government's assertions that he met with other members of the organization on numerous occasions at unidentified locations; that documents seized at the Ponce de Leon safehouse refer to him by his code name; and that documents seized at the El Centro condominium refer to him by his alleged alias. *Affidavit Regarding Standing of Defendant Angel Diaz-Ruiz,* filed February 17, 1987, pp. 4–5;

i) Defendant Orlando Gonzales Claudio also relies on the Government's assertion that he was a leading member of the organization; that he used the El Centro location as a "secret office/safe house"; and that his voice was overheard by Government agents at the El Centro condominium. *Affidavit Regarding Standing of*

tion, the Court accepts these averments as true.

■ It is clear, and generally conceded, that Los Macheteros was operated as a highly organized, clandestine, quasi-military outfit. It is equally clear, at this point, that each defendant, with the exception of Paul Weinberg, was a member of this organization, and that several were leading members. The defendants Jorge Farinacci Garcia and Hilton Fernandez Diamante rely on the Government's aver-

*Defendant Orlando Gonzales Claudio,* filed February 17, 1987, pp. 2-3;

j) Defendant Hilton Fernendez Diamante also relies on the Government's assertions that he was a member of the organization's Directive and Central Committees; that he participated in secret meetings at various locations, and, specifically, with other members of the organization at a beach in Puerto Rico; that his fingerprints were found on documents seized at the Ponce de Leon location; that among the records seized at the Ponce de Leon location were some of his personal records; and that his conversations were overheard by Government agents at the El Centro condominium. *Affidavit Regarding Standing of Defendant to contest Evidence Derived from Physical Searches,* filed [on behalf of defendant Hilton Fernandez Diamante] February 17, 1987, pp. 5-9;

k) Defendant Luis Colon Osorio also relies on the Government's assertions that his fingerprints appear on a document seized at the Ponce de Leon location; that documents seized at this location refer to him by his alleged code name; that he was observed entering and leaving the El Centro condominium on one occasion; that he was, at one point, the bookkeeper of the organization; that the defendant's voice was overheard by Government agents at the El Centro location; and that he met with non-defendant Sylvia Mulling Cowert on occasion to discuss bookkeeping matters at the El Centro safehouse. *Affirmation Regarding Standing to Suppress Evidence Obtained from Various Premises,* filed [on behalf of defendant Luis Colon Osorio] February 17, 1987, pp. 3-7;

l) Defendant Luz Berrios Berrios also relies on the Government's assertions that she was an influential member of the organization; that her fingerprints appear on a document seized at the Ponce de Leon safehouse, and that documents seized at this location refer to her by her alleged code name. *Affidavit Regarding the Standing of Defendant Luz M. Berrios Berrios,* filed February 17, 1987, p. 5;

m) Defendant Filiberto Ojeda Rios also relies on the Government's assertions that he was the leader of the organization; and that documents seized from the Ponce de Leon location bore his fingerprints and referred to him by his alleged

ments that they were members of the organization's Central Committee. These defendants, and defendants Elias Castro Ramos and Juan Segarra Palmer, rely on the Government's averments that they were members of the organization's Directive Committee. Defendant Isaac Camacho Negron relies on the Government's claim that he was the organization's treasurer. Defendant Filiberto Ojeda Rios portrays himself as the ringleader of the organization, and Luis Colon Osorio relies on the

code name. *Affidavit Regarding Filiberto Ojeda's "Standing" to Suppress Evidence Obtained from Various Premises,* filed February 17, 1987, pp. 3-4.

Certain defendants have failed to submit any claims with regard to particular locations:

a) Defendants Ivonne Melendez Carrion, Antonio Camacho Negron, Juan Segarra Palmer, Filiberto Ojeda Rios, Angel Diaz Ruiz, Orlando Gonzales Claudio, and Luz Berrios Berrios have all failed to file any individual standing claim with regard to Apartment 1012A—they merely join in the collective assertion of standing on the basis of the group's collective standing theory with regard to this location. *Memorandum of Law in Support of Motion to Suppress,* filed [on behalf of all defendants and on behalf of defendant Elias Castro Ramos] December 22, 1986, p. 3;

b) Defendant Roberto Maldonado Rivera has failed to file any standing claim with regard to any of the locations at issue—he apparently joins in the defendants' collective motions to suppress, but does not offer any individual submissions to support his assertion of standing.

One defendant has filed a more particularized claim purporting to detail his relationship to the Ponce de Leon premises:

Defendant Filiberto Ojeda Rios alleges 1) that on the date of the search, Suite 301, 210 Ponce de Leon avenue, was his "office;" 2) that he kept this office locked at all times, and that he possessed the key; 3) that he maintained this office for the purpose of storing documents chronicling the struggle of the people of Puerto Rico for independence, and that he had personally collected and preserved these documents over the years as an "archive"; 4) that he personally arranged for the selection of the location, its leasing, furnishing, and equipping; and 5) that he made all such arrangements in a highly secret and private manner so as to preserve anonymity, to protect the secrecy of the items stored in the location, and to protect against detection by those who might seek to destroy the contents of the archives. *Supplemental Affidavit in Support of Motion to Suppress,* filed [by Filiberto Ojeda Rios] January 29, 1987. *See also Memorandum of Law in Support of Motion to Suppress Evidence Seized from*

assertion that, at some point, he was the organization's bookkeeper. The Court finds, for the purposes of evaluating the defendants' standing arguments, that these factual assertions are indeed correct.

It is also clear that each defendant, as an alleged participating member of Los Macheteros, attempted to keep the group's and his or her own exploits a secret. Indeed, the Government's averments, on which the defendants claim to rely, illustrate numerous examples of the extreme measures undertaken by certain members at various times to hide their identity, conceal their activities, and otherwise avoid detection. *See Consolidated Memorandum in Support of Motion to Suppress,* filed [on behalf of all defendants and on behalf of defendant Orlando Gonzales Claudio] December 22, 1986, p. 7 ("members of Los Macheteros took great care to avoid surveillance—electronic or visual"); *Supplemental Memorandum of Defendant Jorge Farinacci Garcia,* filed [on behalf of all defendants] December 23, 1986, p. 19 (citing *Affidavit of Special Agent Jose Rodriquez,* dated April 27, 1984, pp. 36–40) ("Los Macheteros trained its members to use counter surveillance techniques and to avoid detection when going and coming from 'safehouses,' including the alleged 'safehouse' belonging to Los Macheteros

located at [Ponce de Leon]"); *Affidavit Regarding Standing of Defendant Isaac Camacho-Negron,* filed February 17, 1987, pp. 3–5 (citing examples given by the Government for the purposes of establishing standing). To the extent the defendants rely on these averments for the purposes of their standing arguments, the Court concludes that they are accurate.

2. The Defendants' Individual Interests in the Organization's "Safehouses"

■ With the possible exception of Filiberto Ojeda Rios, no defendant claims a possessory or proprietary interest in any of the locations at issue, other than through his or her ties to the organization.[10] In detailing the elaborate security measures undertaken to maintain their privacy, defendants rely on the Government's averment that *"the organization* budgeted money for rental and purchase of residences and other premises to be used by the organization...." *Id.* p. 26 (emphasis added). *See Consolidated Memorandum in Support of Motion to Suppress,* filed [on behalf of all defendants and on behalf of defendant Orlando Gonzales Claudio] December 22, 1986, p. 4 ("[t]he organization is alleged to have rented or purchased the 'safehouses' ..."). No defendant claims that he or she used the premises at issue for personal purposes.[11] *See Affida-*

*Suite 301,* filed [on behalf of Defendant Filiberto Ojeda Rios] May 15, 1987.

**10.** Defendant Ojeda claims that the Ponce de Leon location was his office. *See* note 9, *supra.*

**11.** Defendant Ojeda claims that he used the Ponce de Leon premises to store documents that "form a part of the national patrimony of the people of Puerto Rico, and constitute a significant part of the archives of the independence movements for the period of the last fifteen years." *Affidavit,* at 4. He also demands that these "archives" be transferred to the Institute of Puerto Rican Culture (National Archives) "for preservation." *Id.* at 4. It is unclear from his affidavit whether Mr. Ojeda claims that he used the premises for the personal purpose of collecting these documents for his own personal use, or whether he collected these documents for the benefit of the organization, or whether he collected these documents for the benefit of the Puerto Rican people in general.

Defendant Hilton Fernandez Diamante claims that "[w]ith respect to premises on Ponce de Leon Avenue ..., the government's sworn

records assert that large quantities of the defendant's personal records were seized at the ... location...." *Affidavit,* filed [on behalf of defendant Hilton Fernandez] February 17, 1987, p. 7. The defendant, however, does not cite the sworn record that establishes this fact. The Court had been unable to locate the reference the defendant alludes to. The defendant has also failed to provide so much as a single example of what, among the hundreds of items seized from the Ponce de Leon premises, belonged to him personally. The Court has conducted its own review in an attempt to locate examples of documents that might support the defendant's claim.

There appears listed among the documents seized one brown manila envelope originally containing fourteen items. Each of these fourteen items may be properly characterized as items one might expect an individual to possess in his or her own personal files. Among the items appears a pay check stub in the defendant's name, various items of correspondence between his employer and himself, and other items relating to his past employment as an

*vit in Support of Motion to Suppress Physical Evidence,* filed [on behalf of all defendants and on behalf of defendant Antonio Camacho Negron] February 17, 1987, p. 4 (relying on the Government's statements including the averment that "[s]afehouses are used principally for the business of the organization and not for social or personal purposes ...."). In addition, no defendant claims that he or she resided at any of these locations, or, with the exception of defendant Ojeda, that any location served as his or her personal office. Furthermore, no defendant claims that he or she used any of these safehouses on a regular basis; that (with the sole exception of defendant Ojeda) he or she possessed a key to any of these three places,[12] or that he or she personally owned any of the materials seized at any of these locations.[13] In the absence of allegations to the contrary, and in the face of the Government's denial of standing, the Court concludes that the defendants (with the possible exception of defendant Ojeda) did not use these safehouses for personal purposes, did not possess keys, did not visit them on a regular basis, and did not personally own any of the seized materials.[14]

In support of these findings, the Court also observes that no defendant claims that either the Ponce de Leon premises, the El Centro condominium, or Apartment 1012A were rented in his or her name.[15] As indicated by documents submitted by the defendants in one of their collective memoranda, and on which the defendants claim to rely, the Government reported that the Ponce de Leon location had been rented to

an unknown female who sometimes occupied the premises on Saturday nights. No defendant has identified herself as this unknown female. Furthermore, on August 30, 1985, Government averments, on which the defendants claim to rely, establish that the El Centro Condominium was owned by an individual by the name of Emilio Trenche Calzado. No defendant has detailed his, her, or the organization's relationship to this person. And finally, all parties agree that Apartment 1012A was, at the time of its search, the residence of non-defendant Sylvia Mulling Cowert. On the basis of this information, the Court also concludes that no defendant, with the possible exception of defendant Ojeda, possessed any personal possessory or proprietary interests in any of these three locations at the time of their search other than through his or her ties to the organization.

■ With regard to any possible interest the organization may have had in either the El Centro Condominium, Apartment 1012A, or the Ponce de Leon premises, the Court observes that the defendants do not allege, or claim reliance on any averment alleging, the existence of any personal possessory or proprietary interest in the organization itself (such as that of a shareholder, or sole proprietor). The defendants do claim to rely on the Government's averments that some were members of the organization, and even that some were leading members of the organization. The Court finds on this basis that defendants may have had differing degrees of membership interest in the locations controlled by their organiza-

epidemiologist. However, these do not constitute an appreciable quantity of personal documents. The defendant does not allege that the specific location on the premises from which the manila envelope was seized was an area over which he had any personal control, responsibility, or other personal interest. The defendant does not allege that he put the documents in this location or directed that they be stored there. The defendant has made no claim that he retained any interest in these records at the time of the search of the Ponce de Leon location.

12. Defendant Ojeda alleges that he possessed the key to the Ponce de Leon location, and that he kept it locked at all times. *Affidavit,* at 1. The

defendant does not allege, however, that he actually ever visited the Ponce de Leon premises in the months prior to its search.

13. *See* note 11, *supra,* with regard to the claims of defendant Hilton Fernandez Diamante.

14. The Court finds, however, that defendant Ojeda Rios' affidavits properly suggest that he may have used the location for personal purposes, may have possessed a key, and may have held some personal possessory interest in some of the items seized.

15. Defendant Ojeda Rios claims that he arranged for the rental of the Ponce de Leon premises. *Affidavit,* at 2.

tion.[16] However, the defendants do not typically distinguish or detail their interests. Furthermore, the Court also finds that, with regard to the El Centro condominium and Apartment 1012A, most defendants were not even members of the faction that controlled these locations at the time of their search, and, in fact, the only individual who actually visited these premises on a fairly regular basis was the non-defendant Sylvia Mulling Cowert.[17] Thus each defendant's interest in these two locations must be qualified accordingly.

## C. The Adequacy of the Defendants' Standing Claims

The defendants argue that their affidavits and other submissions set out proper standing claims entitling them to seek the suppression of evidence obtained as a result of the searches at issue in this ruling.

16. Defendant Ojeda, however, suggests in his affidavit that, as the leader of the organization, he was responsible for the details of operating the Ponce de Leon location. The Court concludes that he, in his official capacity as leader of the organization, may have possessed an interest distinguishable from that alleged by the other defendants.

17. Information submitted by the Government, on which the defendants claim to rely, establishes that Los Macheteros split into two factions, the new EPB–Macheteros and the new PRTP–Macheteros, on June 3, 1984. Filiberto Ojeda allegedly led the splinter EPB faction. Fugitive defendant Avelino Gonzales Claudio allegedly led the PRTP faction. The EPB faction split again in February of 1985, with the newer splinter group led by defendant Juan Segarra Palmer. Members associated with Filiberto Ojeda's group include defendants Orlando Gonzales Claudio, Luis Colon Osorio, Antonio Camacho Negron, Isaac Camacho Negron, and Roberto Maldonado Rivera. Defendants associated with the PRTP faction include defendants Elias Castro Ramos, Jorge Farinacci Garcia, and Hilton Fernandez Diamante. Defendants associated with Juan Segarra's group include defendants Luz Berrios Berrios, Norman Ramirez Talavera, and Carlos Ayes Suarez. *See Government's Title III Discovery,* Volume XVIII, *Affidavit of Jose P. Rodriquez,* [submitted as part of application for renewal of electronic surveillance order for El Centro condominium] dated August 23, 1985, pp. 44–45. (The defendants do not deny that this split occurred. On the contrary, they rely on this as certain fact with regard to claims they have made concerning whether affidavits supporting various search warrants issued on Au-

The Court finds, however, that each defendant, with the exception of Filiberto Ojeda Rios, has failed to file an adequate claim on which this Court could proceed to find that he or she possesses standing to challenge the Government's evidence. In reaching this conclusion, the Court rejects the defendants' characterizations of substantive Fourth Amendment law as permitting them to claim standing on the typically undetailed and unresponsive allegations they have submitted.

The Court begins its analysis of the defendants' collective and individual claims by first discussing the relevant substantive Fourth Amendment principles which are dispositive of the defendants' collective theories. The Court analyzes at length the viability of the defendants' corporate standing theories within this legal framework. The Court concludes that the defendants'

gust 30, 1985 properly associate certain defendants with other defendants, and whether information concerning the breakup of the organization was improperly withheld from the issuing magistrate). Given that members of defendant Ojeda's faction used the El Centro condominium, and given that no defendant from any of the other factions claims control, use, or access to either the condominium or the apartment (or points to any averment made by the Government that suggests control, use, or access), the Court finds that no defendant outside Ojeda's faction retained a significant interest in apartment or condominium at the time of its search. *See Transcript of Proceedings of May 14, 1987,* p. 10 (testimony of Agent Rodriquez) (testifying that the organization split in the manner described in the affidavit, with the modification that the second split may have occurred one or two months after February of 1985, but in any event before August 30, 1985).

The Court also finds that electronic surveillance conducted at the El Centro condominium in the months prior to August 30, 1985 reveals that this location was used on a regular basis only by non-defendant Sylvia Mulling Cowert to pursue her recordkeeping and typing tasks for the organization. The same electronic surveillance reveals that only four defendants actually visited this location as is evidenced by overhears of their conversations: Filiberto Ojeda, Orlando Gonzales, Luis Colon, and Roberto Maldonado. *See Government's Title III Discovery,* Volume XIX. The same evidence also reveals that these defendants visited the location only sporadically, and then only for brief periods of time. In addition, no defendant either claims or relies on any other averment claiming that he or she ever visited Apartment 1012A.

"corporate" theories are invalid and unavailing.

The Court continues its analysis of the defendants' standing assertions through the application of certain relevant substantive and procedural principles to each defendant's individual submissions. Here the Court considers whether each defendant has met specific burdens imposed by 1) the Fourth Amendment, 2) the Court's prior "Standing" order, and 3) the Rules of Criminal Procedure. The Court finds that each defendant has failed to meet these burdens, and that each defendant's claim of standing must be denied.

### 1. Fourth Amendment Standing

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." The Supreme Court, in approving the practice of excluding from trial evidence obtained as a result of an unlawful search or seizure, has given this guarantee significant practical effect. *Simmons v. United States*, 390 U.S. 377, 389, 88 S.Ct. 967, 973, 19 L.Ed.2d 1247 (1968) (citing *Weeks v. United States*, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914); *Mapp v. Ohio*, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961)). *See United States v. Calandra*, 414 U.S. 338, 347, 94 S.Ct. 613, 619, 38 L.Ed.2d 561 (1974) (the purpose of the exclusionary rule is to deter future unlawful invasions of privacy by law enforcement officials). The Court has found, however, that indiscriminate application of the exclusionary rule is not without significant societal cost. *United States v. Salvucci*, 448 U.S. 83, 94, 100 S.Ct. 2547, 2554, 65 L.Ed.2d 619 (1980) (quoting *Alderman v. United States*, 394 U.S. 165, 174–75, 89 S.Ct. 961, 967, 22 L.Ed.2d 176 (1969); *Rakas v. Illinois*, 439 U.S. at 137, 99 S.Ct. at 427. Accordingly, the Court has limited the range of circumstances under which defendants may invoke the rule.

The Supreme Court has held that "the exclusionary rule is an attempt to effectuate the guarantees of the Fourth Amendment," and that "it is proper to permit only defendants whose Fourth Amendment rights have been violated to benefit from the rule's protections." *Id.* at 134, 99 S.Ct. at 425. Consistent with this finding, the Court has limited the exclusionary rule's remedial scope to cover only circumstances in which a defendant can claim that Government agents violated his or her Fourth Amendment rights. *United States v. Salvucci*, 448 U.S. at 86–87, 100 S.Ct. at 2550 (quoting *Hatch v. Reardon*, 204 U.S. 152, 160, 27 S.Ct. 188, 190, 51 L.Ed. 415 (1907)). Courts contemplating motions to exclude evidence must therefore look to the Amendment itself to determine if a particular defendant is entitled to seek the suppression of evidence through application of the rule.

It has long been recognized that the Fourth Amendment " 'protects people, not places.' " *Smith v. Maryland*, 442 U.S. 735, 739, 99 S.Ct. 2577, 2579, 61 L.Ed.2d 220 (1979) (quoting *Katz v. United States*, 389 U.S. 347, 353, 88 S.Ct. 507, 512, 19 L.Ed.2d 576 (1967). More specifically, the Supreme Court has held that the Fourth Amendment "protects people from unreasonable government intrusions into their legitimate expectations of privacy." *United States v. Chadwick*, 433 U.S. 1, 7, 97 S.Ct. 2476, 2481, 53 L.Ed.2d 538 (1977).[18]

---

18. As stated, the Fourth Amendment is offended by 1) "unreasonable" government invasions of 2) "legitimate" expectations of privacy. A legitimate expectation of privacy is one that is "reasonable." *Smith v. Maryland*, 442 U.S. at 740, 99 S.Ct. at 2580. Thus we have two questions of reasonableness.

Issues of standing focus on the reasonableness of an individual defendant's privacy expectations with regard to a particular location searched or item seized. This in turn devolves into questions of (A) whether the defendant in fact had any subjective privacy expectations with regard to the location or item, and (B) whether such expectations are expectations society is prepared to accept as reasonable.

The "reasonableness" of the Government's intrusion into a reasonably held expectation of privacy is measured in a different manner. This aspect of Fourth Amendment jurisprudence focuses not on what expectations the defendant had with regard to a particular location searched or item seized, but rather on the nature of the police behavior in conducting the particular search or seizure at issue. Here, "[w]hat is reasonable depends on the context

Finding such expectations to be inherently personal, *United States v. Watson*, 423 U.S. 411, 455, 96 S.Ct. 820, 843, 46 L.Ed.2d 598 (1976) (Marshall, J. dissenting); *Simmons v. United States*, 390 U.S. at 389, 88 S.Ct. at 973, the Court has ruled that the legitimate privacy expectations of others may not be "vicariously" asserted. *United States v. Salvucci*, 448 U.S. at 86, 100 S.Ct. at 2550 (citing *Alderman v. United States*, 394 U.S. at 174, 89 S.Ct. at 973; *Brown v. United States*, 411 U.S. 223, 230, 93 S.Ct. 1565, 1569, 36 L.Ed.2d 208 (1973)). Thus, defendants wishing to invoke the force of the exclusionary rule may not do so merely on the basis that the Government conducted an illegal search or seizure. Rather, application of the rule depends, among other things, on whether the defendant has made out a proper claim that the illegal search or seizure invaded a personally held, reasonable expectation of privacy. *Smith v. Maryland*, 442 U.S. at 740, 99 S.Ct. at 2580. *See United States v. Smith*, 621 F.2d 483, 486 (2d Cir.1980), *cert. denied*, 449 U.S. 1086, 101 S.Ct. 875, 66 L.Ed.2d 812 (1981) ("[i]n our post-*Rakas* [*v. Illinois*] world ... a defendant is obliged to show that he had a legitimate expectation of privacy in the area searched before he can invoke the protection of the Fourth Amendment").

The Supreme Court has developed a two-part standing test useful to determine whether a particular defendant's personal expectations are indeed reasonable within the meaning of the Fourth Amendment. Largely adopting the approach taken by Justice Harlan in his concurring opinion in *Katz v. United States*, 389 U.S. 360, 88 S.Ct. at 516, the Supreme Court has found that a proper standing inquiry

normally embraces two discrete questions. The first is whether the individual, by his conduct, has 'exhibited an actual (subjective) expectation of privacy' ... —whether ... the individual has shown that 'he seeks to preserve [something] as private.' ... The second question is whether the individual's subjective expectation of privacy is 'one that society is prepared to recognize as "reasonable" ' ...—whether ... the individual's expectation, viewed objectively, is 'justifiable' under the circumstances.

*Smith v. Maryland*, 442 U.S. at 740, 99 S.Ct. at 2580 (citations omitted).

■ The first prong of this test is fairly straightforward. To satisfy the subjective interest requirement, the defendant must show that he or she personally sought to preserve the particular location, and its contents, as private. *See Rawlings v. Kentucky*, 448 U.S. at 104, 100 S.Ct. at 2561 (defendants bear the burden of establishing the existence of a legitimate expectation of privacy); *United States v. McHugh*, 769 F.2d 860, 864 (1st Cir.1985) ("the burden is on the defendant to establish not only that he had a subjective expectation, but also that this expectation was objectively reasonable"). To meet this burden a defendant must demonstrate 1) that he or she possessed a significant, personal privacy interest in the location searched, and 2) that his or her privacy expectation existed contemporaneously with the search or seizure. *See United States v. Manbeck*, 744 F.2d 360, 374 (4th Cir.1984), *cert. denied*, *O'Hare v. United States*, 469 U.S. 1217, 105 S.Ct. 1197, 84 L.Ed.2d 342 (1985) ("[t]he privacy interest that must be established to support standing is an interest in

within which a search takes place." *New Jersey v. T.L.O.*, 469 U.S. 325, 337, 105 S.Ct. 733, 741, 83 L.Ed.2d 720 (1985). A particular type of search that would be unreasonable with regard to one location under one set of facts might be found to be reasonable with regard to another location under different circumstances. *See e.g. United States v. Mankani*, 738 F.2d 538, 544 (2d Cir.1984) ("[s]ince a hotel room is exposed to others, it is unlike a 'house,' i.e. a place where one lives. ... [T]here is an accepted loss of privacy when one occupies a public place ...."). As the Court has stated, "[a] determination of

the standard of reasonableness applicable to a particular class of searches requires 'balanc[ing] the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion.'" *O'Connor v. Ortega*, — U.S. —, 107 S.Ct. 1492, 1499, 94 L.Ed.2d 714 (1987) (opinion of O'Connor, J.) (quoting *United States v. Place*, 462 U.S. 696, 703, 103 S.Ct. 2637, 2642 77 L.Ed.2d 110 (1983); citing *Camara v. Municipal Court*, 387 U.S. 523, 536–37, 87 S.Ct. 1727, 1734–35, 18 L.Ed.2d 930 (1967)).

the area searched, not an interest in the item[s] found ... [a]t most, an interest in the items found may be a factor considered when deciding whether there is a privacy interest in the area searched"); *United States v. Garcia,* 741 F.2d 363, 366 (11th Cir.1984) (the defendant's privacy interest in the searched premises must be both "significant" and contemporaneous with the search); *United States v. Vicknair,* 610 F.2d 372, 379 (5th Cir.1980), *cert. denied,* 449 U.S. 823, 101 S.Ct. 83, 66 L.Ed.2d 25 (1980) (the defendant's interest must be personal in nature rather than derivative of a collective interest). A defendant satisfies this prong of the test by alleging facts sufficient to create the impression that his or her relationship with the location was personal in nature; was more than sporadic, irregular, or inconsequential; and that the defendant maintained the location and the items within it in a private manner at the time of the search.

■ The second prong of the Court's standing test is more exacting, *Hudson v. Palmer,* 468 U.S. 517, 525 n. 7, 104 S.Ct. 3194, 3199 n. 7, 82 L.Ed.2d 393 (1984), and turns largely on close analysis of the totality of facts and circumstances surrounding each individual defendant's particular standing claim.[19] *United States v. Salvucci,* 448 U.S. at 91–93, 100 S.Ct. at 2552–53; *United States v. Brown,* 635 F.2d 1207, 1211 (6th Cir.1980). *See Rakas v. Illinois,* 439 U.S. at 152, 99 S.Ct. at 435 (Powell, J., concurring) (observing that no single facet of a defendant's claim is properly dispositive of the Court's inquiry); *United States v. Sarda-Villa,* 760 F.2d 1232, 1235 (11th Cir.1985) (observing that courts must determine objective reasonableness from a totality-of-the-circumstances perspective); *United States v. Dall,* 608 F.2d 910, 914 (1st Cir.1979), *cert. denied,* 445 U.S. 918, 100 S.Ct. 1280, 63 L.Ed.2d 603 (1980) ("the total circumstances determine whether the one challenging the search has a reasonable expectation of privacy in the locus of the search"). *See also Oliver v. United States,* 466 U.S. 170, 177, 104 S.Ct. 1735, 1740, 80 L.Ed.2d 214 (1984) ("[n]o single factor determines whether an individual legitimately may claim under the Fourth Amendment that a place should be free of government intrusion").[20] Basically, however, the cases demonstrate that, in reviewing any given claim, questions of "reasonableness" turn in large measure on the quality and object of the particular subjective expectation at issue.

■ Courts have traditionally evaluated the quality of a given expectation by comparing it to expectations sheltered at the heart of the Fourth Amendment itself. This category of sheltered expectations necessarily has as legitimate objects a wide range of locations and items given that "houses, papers and effects" has been interpreted to include a broad range of places and possessions (even contraband). Nevertheless, courts have categorically limited legitimate privacy expectations to include only those interests of a personal dimension or quality similar in nature to expectations one would normally expect an individual to have with regard to his or her home, office, and personal belongings. Furthermore, despite its depth, the range of proper objects (categories of locations and possessions) of otherwise legitimate expectations is not all-encompassing. Courts have defined the outer reaches of the Amendment's objective scope, concluding that some locations are incapable of sheltering reasonable privacy expectations (prison cells, abandoned locations, and public places), or are capable of harboring reasonable expectations only in some diminished capacity (automobiles, boats, and schools). Thus, as far as the exclusionary rule is concerned, the touchstones of reasonable-

---

**19.** At this point it is important to recognize that questions of subjective interest and reasonableness necessarily overlap. While it is true that the existence of a subjective privacy expectation is a prerequisite of "reasonableness," it is also true that reasonableness depends on a factual and legal evaluation of the basis for the subjective expectation. Thus it is not possible to entirely divorce inquiry under one prong of the test from inquiry under the other.

**20.** An expectation of privacy must not only be reasonable in the abstract, but "must also be reasonable under the circumstances." *United States v. McHugh,* 769 F.2d at 864.

ness are 1) whether the defendant's professed subjective expectation favorably compares to expectations courts have traditionally recognized as legitimate; and 2) whether the object of the defendant's expectation can reasonably be said to be capable of harboring such an expectation.[21]

The practice of comparing a defendant's claim with traditional notions of what constitutes a reasonable expectation of privacy (with its focus on normative expectations surrounding the home or an individual's personal effects) is one long recognized by the Supreme Court. *See Payton v. New York,* 445 U.S. 573, 587, 100 S.Ct. 1371, 1380, 63 L.Ed.2d 639 (1980) (quoting *Dorman v. United States,* 435 F.2d 385, 389 (D.C.Cir.1970) (" '[f]reedom from intrusion into the home or dwelling is the archetype of the privacy protection secured by the Fourth Amendment' "). Thus "[a] hotel room, in the eyes of the Fourth Amendment, may become a person's 'house,' and so, of course, may an apartment." *Lanza v. New York,* 370 U.S. 139, 143, 82 S.Ct. 1218, 1220, 8 L.Ed.2d 384 (1962) (citing *Lustig v. United States,* 338 U.S. 74, 69 S.Ct. 1372, 93 L.Ed. 1819 (1949); *United States v. Jeffers,* 342 U.S. 48, 72 S.Ct. 93, 96 L.Ed. 59 (1951); and *Jones v. United States,* 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960)). Thus "[a] prison 'shares none of the attributes of privacy of a home, an automobile, an office, or a hotel room.' " *Hudson v. Palmer,* 468 U.S. at 527, 104 S.Ct. at 3200 (quoting *Lanza v. New York,* 370 U.S. at 143–44, 82 S.Ct. at 1220–21). This comparative approach permeates Fourth Amendment standing analysis. *See Rakas v. Illinois,* 439 U.S. at 153–54, 99 S.Ct. at 435–36 (Powell, J., concurring) (quoting *United States v. Martinez-Fuerte,* 428 U.S. 543, 561, 96 S.Ct. 3074, 3084, 49 L.Ed.2d 1116 (1976) ("[n]othing is better established in Fourth Amendment jurisprudence than the distinction between one's expectation of privacy in an automobile and one's expectation when in other locations. We have repeatedly recognized that this expectation ... '[is] significantly different from the traditional expectation of privacy and freedom in one's residence' "). *See also United States v. Holland,* 755 F.2d 253, 255 (2d Cir.1985), *cert. denied,* 471 U.S. 1125, 105 S.Ct. 2657, 86 L.Ed.2d 274 (1985) (some locations are not properly within a defendant's zone of privacy "even though they are guarded by locked doors"); *United States v. Mankani,* 738 F.2d 538, 544 (2d Cir.1984) (comparing hotel rooms with residences, observing that "it is the transitory nature of such places [hotels] ... that diminishes a person's justifiable expectation of privacy in them").

One explanation for this standard's comparative focus on normative expectations centered on the home and on an indi-

---

**21.** The Court finds that the locations at issue are not inherently incapable of harboring reasonable expectations of privacy. The Ponce de Leon premises, the El Centro condominium, and Apartment 1012A are not public or common areas, nor were these locations or their contents ever open to public inspection.

The Government claims that the Ponce de Leon premises, the El Centro condominium, and Apartment 1012A are all "safehouses" used in furtherance of the defendants' alleged terrorist activities. The question arises as to whether a "safehouse" is a location which, by its nature, is incapable of sheltering reasonable expectations of privacy in the same manner as a home or office. Conceivably, society might be willing to accept a given expectation of privacy as reasonable if its object were a home, but not if its object were a "safehouse," even though the expectation were the same in the eyes of the defendant. Surely a "safehouse" is not entitled to precisely the same consideration as a "house" within the meaning of the Fourth Amendment.

However, the Court is not convinced that "safehouses" are sufficiently similar to prison cells so as to be properly stripped of their capability of harboring normal, legitimate privacy expectations as far as standing is concerned. Moreover, the Court is not convinced that it should classify "safehouses" as locations capable of harboring only diminished expectations of privacy so as to require each defendant to demonstrate a greater level of objective reasonableness to establish his or her standing claim. The Court reiterates that the Fourth Amendment "protects people, not places," *Smith v. Maryland,* 442 U.S. at 739, 99 S.Ct. at 2579, and concludes that no exigent circumstances exist sufficient to justify diminishing the privacy status of the locations at issue with regard to the defendants' standing claims. *See* note 11, *infra.* Consequently, the Court views the Ponce de Leon premises, the El Centro condominium, and Apartment 1012A as not incapable of harboring reasonable privacy expectations in the same manner as a home or office is capable of harboring such interests.

vidual's personal effects (other than the obvious explanation that the express language and intent of the Amendment focus inquiry in this direction) is aptly suggested by Judge Sneed, dissenting in *United States v. Quinn*, 751 F.2d 980, 981 (9th Cir.1984), *cert. dismissed as improvidently granted*, —— U.S. ——, 106 S.Ct. 1623, 89 L.Ed.2d 803 (1986), where he states:

> [t]he Fourth Amendment protects the guilty because only by doing so can the innocent be protected. The innocent are not mere incidental beneficiaries of an amendment designed to protect the guilty. The innocent are its prime beneficiaries; the reasonableness of any expectation of privacy should be ascertained from their standpoint.

*See Hudson v. Palmer*, 468 U.S. at 525 n. 7, 104 S.Ct. at 3199 n. 7 (society's viewpoint must be considered in the resolution of standing issues); *Oliver v. United States*, 466 U.S. at 182 n. 13, 104 S.Ct. at 1743 n. 13 ("[c]ertainly the Framers did not intend that the Fourth Amendment should shelter criminal activity wherever persons with criminal intent choose to erect barriers and post 'No Trespassing' signs"); *United States v. Oliver*, 686 F.2d 356, 372 (6th Cir.1982) (en banc), *aff'd.*, 466 U.S. 170, 104 S.Ct. 1735, 80 L.Ed.2d 214 (1984) (quoting *United States v. Oliver*, 657 F.2d 85, 87 (6th Cir.1981) ("society will accept expectations which: 1) are 'normally shared by people in that setting'; and 2) 'fall within the limits of what society can accept given its interest in law enforcement'"). Regardless of the reasoning, however, it is clear that the proper analysis to undertake is to conduct a close, comparative review of any given claim with an eye to determining whether the professed interest comports with well-recognized notions of Fourth Amendment legitimacy.

Based on the foregoing, the Court concludes that, in order to be truly reasonable within the meaning of the Fourth Amendment, a defendant must demonstrate that his or her professed subjective expectation of privacy in a particular location,[22] viewed from the totality of the circumstances, is at least of a quality similar, in significant respects, to the privacy expectation one would ordinarily expect an individual to have with regard to his or her home or office, provided the individual undertook at least minimal efforts to maintain the privacy of the location and its contents.[23] As undetailed as this comparative standard may be, the Court is persuaded that it is a true reflection of the central element of Fourth Amendment reasonableness (the other element being whether the location was capable of sheltering the professed expectation). *Hudson v. Palmer*, 468 U.S. at 525 n. 7, 104 S.Ct. at 3199 n. 7. *See Rakas v. Illinois*, 439 U.S. at 143 n. 12, 99 S.Ct. at 430 n. 12 ("legitimation of expectations of privacy by law must have a source outside of the Fourth Amendment," including "reference to ... understandings that are recognized and permitted by society"); *id.* at 152–53, 99 S.Ct. at 435 (Powell, J., concurring) ("[t]hus, the Court has examined whether a person invoking the protection of the Fourth Amendment took normal precautions to maintain his privacy—that is, precautions customarily taken by those seeking privacy"). *See also O'Connor v. Ortega*, —— U.S. ——, 107 S.Ct. 1492, 1498, 94 L.Ed.2d 714 (1987) (opinion of O'Connor, J.) (quoting *Oliver v. United States*, 466 U.S. at 178 n. 8, 104 S.Ct. at 1741 n. 8) ("[a]s with the expectation of privacy in one's home, such an expectation in one's place of work is 'based upon societal expectations that have deep roots in the history of the Amendment'"). If analysis of the totality of the circumstances reveals a substantial

---

**22.** The Court does not here discuss professed privacy interests with regard to an individual's person. Nor does the Court discuss professed privacy interests held with regard to personal effects searched or seized outside of a home, office, or similar location (where Fourth Amendment protections may apply in some diminished capacity).

**23.** A given expectation need not be exactly similar to those mainstream expectations courts have come to recognize as legitimate in the eyes of the Fourth Amendment. Privacy rights are not defined singularly by unexamined reference to what is normal or what is a commonly accepted belief.

similarity in quality between a given subjective expectation and those traditionally recognized as legitimate, then, in the absence of mitigating circumstances (such as in situations involving incarceration, or where the location searched was abandoned or generally subject to the public view, or where the item seized was placed in a public area), a court may properly conclude that the individual possesses standing with regard to the location and its contents. *See Hudson v. Palmer,* 468 U.S. at 525–26, 104 S.Ct. at 3199–3200 (a prison cell is not capable of sheltering expectations of privacy); *United States v. Holland,* 755 F.2d at 255–56 (citing *Rakas v. Illinois,* 439 U.S. at 149, 99 S.Ct. at 433) (holding that the entranceway to a common hallway is not capable of harboring a reasonable expectation of privacy due to its inherently public nature, and observing that an expectation of privacy "will be violated only if the place is one that the defendant has the right to keep private and subject to his exclusive control"); *United States v. Briones-Garza,* 680 F.2d 417, 421 (5th Cir.1982), *cert. denied,* 459 U.S. 916, 103 S.Ct. 229, 74 L.Ed.2d 181 (1982) (a "drop-house" harboring a constant stream of illegal aliens lacks "normal expectations of privacy" even though the defendant claimed it was his residence); *United States v. Arboleda,* 633 F.2d 985, 991 (2d Cir.1980), *cert. denied,* 450 U.S. 917, 101 S.Ct. 1362, 67 L.Ed.2d 343 (1981) (defendant who tossed the contraband out the window and into the public domain found to have lost his expectation of privacy thereby; "[i]t is difficult to imagine a legitimate expectation of privacy in an open area running along the front of the second floor of a building over a street").

▇ A defendant establishes a colorable standing claim by alleging sufficient facts to create a reasonable impression with the Court of the objective rationality (under the above standard) of his or her professed subjective privacy allegations. If the Government reasonably contests

such a claim,[24] the defendant is entitled to a hearing where he or she is required to prove facts necessary to support his or her professed subjective expectations and the overall reasonableness of his or her position. *See Jones v. United States,* 362 U.S. 257, 261, 80 S.Ct. 725, 731, 4 L.Ed.2d 697 (1960) ("[i]t is entirely proper to require of one who seeks to challenge the legality of a search as the basis for suppressing relevant evidence that he allege, and if the allegation be disputed that he establish, that he himself was the victim of an invasion of privacy"). *See also Rawlings v. Kentucky,* 448 U.S. at 104, 100 S.Ct. at 2561 ("[the defendant], of course, bears the burden of proving not only that the search … was illegal, but also that he had a legitimate expectation of privacy in the [place searched]"); *Rakas v. Illinois,* 439 U.S. at 131 n. 1, 99 S.Ct. at 424 n. 1 ("[t]he proponent of a motion to suppress has the burden of establishing that his own Fourth Amendment rights were violated by the challenged search or seizure"); *Simmons v. United States,* 390 U.S. at 389, 88 S.Ct. at 973 ("defendants [have] the right, upon motion and proof, to have excluded from trial evidence which has been secured by means of an unlawful search and seizure"); *United States v. McHugh,* 769 F.2d at 864 (defendants bear the burden of establishing both the existence and the objective reasonableness of their expectations); *United States v. Ramapuram,* 632 F.2d 1149, 1154 (4th Cir.1980), *cert. denied,* 450 U.S. 1030, 101 S.Ct. 1739, 68 L.Ed.2d 225 (1981) ("it devolves upon one seeking suppression of incriminating evidence to establish as a threshhold matter the existence of a reasonable expectation of privacy in the area searched").

The defendants predictably argue that their professed collective expectations with regard to the Ponce de Leon, El Centro, and Apartment 1012A locations are manifestly "reasonable." For numerous reasons, the defendants' collective allegations,

---

**24.** As stated, the Government's objection must be reasonable. The Court would not permit the Government to contest standing solely for the purpose of making the defendants go to the trouble of proving standing where in fact no serious question of standing existed. The Government, however, has in no way attempted to harass the defendants in this manner.

however, do not easily fit within the general range of permissible standing claims encompassed within the parameters set forth in the various decisions cited above. The Court is persuaded that to accept the defendants' collective arguments would be to create a new category of Fourth Amendment deprivation victims outside the boundaries established by prior Supreme Court precedent. The Court is not persuaded that it is free to so enlarge the scope of the exclusionary rule. Before turning to the specifics of the defendants' collective standing arguments, the Court prefaces its discussion with general consideration of the difficulties involved in entertaining an expansion of Fourth Amendment protections. The Court then turns to the particulars of the defendants' collective claims and the specific difficulties they present.

The Supreme Court has expressly rejected or overruled a variety of expansive standing theories, and, in so doing, has reaffirmed its adherence to the particular, narrow privacy interest analysis outlined above to define who is a proper Fourth Amendment deprivation victim entitled to standing. *See United States v. Allison*, 619 F.2d 1254, 1258 (8th Cir.1980) (the Court has adopted an analytical posture that avoids lending "credence to theories of standing which [are] inconsistent with the Court's view of the nature of fourth amendment rights"). For example, in *United States v. Salvucci*, 448 U.S. at 95, 100 S.Ct. at 2554, the Court expressly overruled the automatic standing rule adopted in *Jones v. United States*, 362 U.S. at 264–65, 80 S.Ct. at 732–33, which allowed defendants, in cases where possession of the seized item was an essential element of the offense charged, to have automatic standing to challenge the search and seizure of the item. Addressing the argument that retention of the *Jones* rule would "maximize the deterrence of illegal police conduct by permitting an expanded class of poten-

tial challengers," *United States v. Salvucci*, 448 U.S. at 94, 100 S.Ct. at 2554, the Court nevertheless rejected the rule's "underlying assumption ... that possession of the seized good is an acceptable measure of Fourth Amendment interests," *id.* at 92, 100 S.Ct. at 2553, concluding that the rule served "only to afford a windfall to defendants whose Fourth Amendment rights have *not* been violated." *Id.* at 95, 100 S.Ct. at 2554 (emphasis in original).

Similarly, in *Rakas v. Illinois, supra,* the Court rejected the defendants' "target theory" of standing which would have permitted a defendant to challenge admission of evidence obtained as a result of an unlawful search or seizure merely because that defendant had been a target of the search or seizure. *Id.* at 132–33, 99 S.Ct. at 424. Once again, the Court observed that "[c]onferring standing to raise vicarious Fourth Amendment claims would necessarily mean a more widespread invocation of the exclusionary rule during criminal trials" with its attendant deterrent effect. *Id.* at 137, 99 S.Ct. at 427. The Court declined to permit such an expansion, stating:

[e]ach time the exclusionary rule is applied it exacts a substantial cost for the vindication of Fourth Amendment rights. Relevant and reliable evidence is kept from the trier of fact and the search for truth is deflected.

*Id.* at 137–38, 99 S.Ct. at 427 (citations omitted). The Court added that "[a] person who is aggrieved by an illegal search and seizure only through the introduction of damaging evidence secured by a search of a third person's premises or property has not had any of his Fourth Amendment rights infringed." *Id.* at 134, 99 S.Ct. at 425.[25]

As one explanation for continued adherence to its reasonable privacy interest approach, the Court has repeatedly asserted that application of the privacy interest

**25.** Similarly, in *Katz v. United States*, 389 U.S. at 351, 88 S.Ct. at 511, the Court explicitly rejected a "proferred locational theory" of standing; "proferred locational theory" meaning the theory that the Fourth Amendment protects certain locations from unreasonable searches and seizures rather than expectations of privacy in

those locations. *See Oliver v. United States*, 466 U.S. at 187, 104 S.Ct. at 745 (Marshall, J., dissenting) (defining the phrase "proferred locational theory"). *See also Alderman v. United States*, 394 U.S. at 171, 89 S.Ct. at 965 (rejecting automatic standing for co-defendants and co-conspirators).

standard serves the dual purpose of protecting important Fourth Amendment rights, while at the same time permitting as little intrusion as possible into the truth finding function of the trial process. In the Court's words:

> The deterrent values of preventing the incrimination of those whose rights the police have violated have been considered sufficient to justify the suppression of probative evidence even though the case against the defendant is weakened or destroyed. We adhere to that judgment. But we are not convinced that the additional benefits of extending the exclusionary rule to other defendants would justify further encroachment upon the public interest in prosecuting those accused of crime and having them acquitted or convicted on the basis of all the evidence which exposes the truth.

*Alderman v. United States,* 394 U.S. at 174–75, 89 S.Ct. at 967.

A further explanation for adherence to the privacy interest analysis can be found in the very nature of the exclusionary rule itself. The Court has held that the rule is a judicially created remedy of limited applicability. *United States v. Leon,* 468 U.S. 897, 906, 104 S.Ct. 3405, 3411, 82 L.Ed.2d 677 (1984) (quoting *United States v. Calandra,* 414 U.S. at 348, 94 S.Ct. at 620); *Stone v. Powell,* 428 U.S. 465, 494 n. 37, 96 S.Ct. 3037, 3052 n. 37, 49 L.Ed.2d 1067 (1976). And while the rule is designed to effectuate important Fourth Amendment rights, *Rakas v. Illinois,* 439 U.S. at 134, 99 S.Ct. at 425, "the application of the rule has been restricted to those areas where its remedial objectives are thought most efficaciously served." *United States v. Calandra,* 414 U.S. at 348, 94 S.Ct. at 620.

■ The Supreme Court has made the determination that to expand applicability of the exclusionary rule beyond the scope of the Amendment would be to fashion an overbroad remedy that would unnecessarily trample other important societal interests. *United States v. Salvucci,* 448 U.S. at 94, 100 S.Ct. at 2554. Thus this Court must seriously consider whether the defendants' claims can logically fit within the remedial scope of the rule as it presently exists. If the defendants claims do not fit within the rule's present parameters, the Court must give serious consideration to the desirability of expanding the rule's coverage to accomodate their interests. However, as the Supreme Court has warned, "misgivings as to the benefit of enlarging the class of persons who may invoke [the exclusionary] rule are properly considered when deciding whether to expand standing to assert Fourth Amendment violations." *Rakas v. Illinois,* 439 U.S. at 138, 99 S.Ct. at 427.

### 2. The Defendants' Legal Arguments

■ The defendants, with the exception of Paul Weinberg (who does not claim standing with regard to any of the locations at issue), offer a general "collective" (or "corporate") standing theory in support of their Fourth Amendment claims.[26] This

---

**26.** The genesis of the defendants' "corporate" theory is itself revealing. The defendants' originally argued that all defendants (with the exception of defendant Weinberg) had standing with regard to *every* location or vehicle used by *any* defendant, be it residence, office, or otherwise. *See e.g. Assertion by Defendant Hilton Fernandez-Diamante,* filed December 22, 1986, pp. 1–3 (claiming standing with regard to 27 locations), *supplemented by Supplemental Assertion of Standing,* dated January 30, 1987 (adding an additional location); *Supplemental Memorandum of Defendant Jorge Farinacci Garcia,* filed December 23, 1986, p. 2 ("[a]ll defendants have standing to challenge all searches of premises used by Los Macheteros"); *Motion by Defendant Ivonne Melendez Carrion to Suppress Physical Items Seized from her Home,* filed [on behalf of all defedants] December 22, 1986, p. 1 (arguing that all defendants have standing with regard to defendant Ivonne Melendez' residence on the grounds 1) that each defendant was a member of Los Macheteros; 2) that Los Macheteros was a highly clandestine organization; 3) that each defendant, as a member, conducted him or herself in a secret manner; and 4) that this residence was used by unnamed defendants at unnamed times for conducting unidentified activities and for storing unidentified organizational materials). The defendants have since refined their arguments, narrowed their claims, redefined their "corporate" standing theory, and abandoned the proposition that each defendant has standing with regard to every office, place of business, residence, or other location used by every other defendant and searched by the Government.

theory is based on the alleged factual premise 1) that each defendant was a member of the organization known as Los Macheteros, and that the organization controlled each of the premises at issue; 2) that each member undertook elaborate security precautions designed to preserve his or her own privacy and anonymity as well as the privacy of the organization and its membership; and 3) that each defendant allegedly participated in various collective activities in a joint venture capacity, utilizing the locations at issue in furtherance of the crimes for which they have been indicted.[27] The defendants' predictably support their collective theory with three related arguments. The first argument, which the Court entitles the "organizational" argument, proposes that each defendant has standing to challenge the legality of the searches and seizures conducted at the El Centro, Ponce de Leon, and Apartment 1012A locations by virtue of the fact that an organization known as "Los Macheteros" controlled these locations and that each defendant was a member of this organization. As one defendant asserts, "all defendants have standing to challenge the searches of [these three locations] by virtue of their alleged active involvement in an organization which allegedly maintained and used the premises secretively for purposes of the organization." *Consolidated Memorandum in Support of Motion to Suppress*, filed Dec. 22, 1986, p. 1.

The defendants' second argument, which the Court labels the "membership-security" argument, is subtly different. Perhaps recognizing that mere membership, without more, is insufficient to confer standing, the defendants claim that, as members of a highly clandestine organization, they took elaborate steps to ensure the secrecy and privacy of these locations and the contents therein; concluding that such actions as they took to maintain the security of their organization establish a legitimate expectation of privacy in premises controlled by the organization. As one defendant explains, "[t]he defendants in the present case rely, to demonstrate their expectation of privacy in [these locations] not upon their mere status as members of an organization but, rather, upon the nature of the organization and the elaborate security measures taken by members to preserve privacy." *Consolidated Memorandum*, at 6–7. As further explained by another defendant,

> [m]oreover, the government's sworn statements aver that defendants were members of a tightly-knit, disciplined and cohesive organization which maintained the premises as so-called 'safehouses,' used them for organizational purposes, limited access only to trusted members of the organization, trained and required members to take extreme precautions to preserve the safety and secrecy of the locations, and kept possessions and documents belonging to all the members collectively and/or to some members individually in these locations, demonstrates that the defendants had personal Fourth Amendment interests and expectations of privacy in the locations searched.

*Supplemental Memorandum of Defendant Jorge Farinacci Garcia,* [filed on behalf of all defendants] filed December 23, 1986, pp. 5–6.

The defendants' third argument, which the Court entitles the "joint venture/co-conspirator" argument, focuses on the defendants' characterization of their activities

---

The defendants' more sophisticated version of their rough collective standing argument, however, is, in reality, merely a more elaborate version of their original broadside of Fourth Amendment jurisprudence. The basic flaw of their original collective theory is that it attaches untoward significance to the defendants' collective status as members of the organization and alleged co-conspirators. This fundamental flaw is carried over in the defendants' present theories. The fact remains, however, that no special Fourth Amendment significance attaches to the fact that the defendants acted collectively. *Al-*

*derman v. United States,* 394 U.S. at 171–76, 89 S.Ct. at 965–68; *United States v. Galante,* 547 F.2d 733, 739 (2d Cir.1976), *cert. denied,* 431 U.S. 969, 97 S.Ct. 2930, 53 L.Ed.2d 1066 (1977). *See United States v. Vicknair,* 610 F.2d at 379 (standing derives from a personal rather than collective expectation of privacy). Collectivity is the central theme of the defendants' argument.

**27.** *See* note 2, *supra.*

as a "joint venture" and their status, to the extent the defendants are collectively involved in the alleged crimes, as "co-conspirators." As fully explained by one defendant, "the government's sworn assertions that defendants are all members and participants in a single conspiracy give them the right to assert privacy interests in locations used for the 'joint venture' [namely the West Hartford robbery] for which they are being tried." *Defendants' Memorandum of Law in Support of Motion to Suppress,* dated December 22, 1986, p. 20.

The Court finds that each individual argument, or "sub-theory," viewed separately, is inadequate by itself to confer standing. Both the "organizational" and "joint venture/co-conspirator" arguments are, by themselves, invalid vicarious standing theories. The defendants' "membership-security" argument, while perhaps a relevant component of a legitimate standing argument, is as well, by itself, insufficient as a matter of law to confer standing. The Court also finds that the defendants' general collective theory, comprised as it is of these arguments, is an unacceptable and incomplete standard against which to measure the viability of the defendants' claims.

The Court discusses the defendants' three broad standing arguments individually, and then proceeds to discuss the defendants' overall collective standing theory as a single unit. After rejecting the defendants' collective theories, the Court examines the specifics of each individual defendant's personal relationship to the locations at issue, concluding that only Filiberto Ojeda Rios has made out a colorable standing claim, and that he has done so only with regard to the Ponce de Leon location.

### a. The Defendants' Organizational Argument

■ In support of their organizational argument the defendants rely, in part, on cases which have recognized a corporation's right to claim Fourth Amendment standing on its own behalf. *See Blackie's House of Beef, Inc. v. Castillo,* 659 F.2d 1211, 1216 n. 5 (D.C.Cir.1981), *cert. denied,* 455 U.S. 940, 102 S.Ct. 1432, 71 L.Ed.2d 651 (1982) (commercial restau-

rant found to have standing to challenge a warrantless search of its premises). *See generally Mancusi v. DeForte,* 392 U.S. 364, 367, 88 S.Ct. 2120, 2123, 20 L.Ed.2d 1154 (1968) ("[t]his Court has held that the word 'houses,' as it appears in the Amendment, is not to be taken literally, and that the protection of the Amendment may extend to commercial premises"). It is certainly true that collective enterprises (at least de jure legal organizations such as unions or corporations) are entitled to claim a form of "corporate" standing. Nevertheless, unlike the situation in the *Castillo* case just cited, the organization known as "Los Macheteros" is not a defendant in this case. *See United States v. Calandra,* 414 U.S. at 348, 94 S.Ct. at 620 ("standing to invoke the exclusionary rule has been confined to situations where the Government seeks to use such evidence to incriminate the victim of the unlawful search"). And whereas "Los Macheteros" as an organization, if it were a defendant, might arguably have standing to contest the legality of a search or seizure of its "corporate" property, the Supreme Court has repeatedly held time and time again that other defendants may *not* under any circumstances vicariously assert the Fourth Amendment rights of one whose rights have been violated. *United States v. Salvucci,* 448 U.S. at 86, 100 S.Ct. at 2550; *Brown v. United States,* 411 U.S. at 230, 93 S.Ct. at 1569 (quoting *Alderman v. United States,* 394 U.S. at 174, 89 S.Ct. at 966). *See United States v. Alonso,* 790 F.2d 1489, 1495 (10th Cir.1986) ("[s]tanding may not be conferred by the Government's activity, no matter how warrantless or illegal it might be, where no constitutionally protected right is violated").

■ The Second Circuit has long ago rejected the type of claim embodied in the defendants' organizational standing argument. In *Lagow v. United States,* 159 F.2d 245, 246 (2d Cir.1946), *cert. denied,* 331 U.S. 858, 67 S.Ct. 1750, 91 L.Ed. 1865 (1947), the court stated:

When a man chooses to avail himself of the privilege of doing business as a corporation, even though he is its sole share-

holder, he may not vicariously take on the privilege of the corporation under the Fourth Amendment; documents which he could have protected from seizure, if they had been his own, may be used against him, no matter how they were obtained from the corporation. Its wrongs are not his wrongs; its immunity in not his immunity. This we have four times decided.

Similarly, mere membership in an organization, without more, is far insufficient to confer standing. *United States v. Allison,* 619 F.2d at 1260. *See Babula v. Immigration & Naturalization Service,* 665 F.2d 293, 297 (3rd Cir.1981) (factory employees "do not have standing to assert the fourth amendment rights of the factory owner"). Nor is partnership, by itself, an adequate basis for standing. *United States v. Hodges,* 606 F.2d 520, 523 (5th Cir.1979), *cert. denied,* 444 U.S. 1035, 100 S.Ct. 708, 62 L.Ed.2d 671 (1980). In the Court's view, the defendants may not look to the organization's interests in the locations to substantiate their individual claims. The defendants instead must draw from their own individual ties to each location to demonstrate the existence of reasonable expectations of privacy. *United States v. Hartley,* 486 F.Supp. 1348, 1353–54 (M.D.Fla.1980). Membership in the organization thus serves as merely one relevant factor to consider in judging the overall validity of a given claim, and then only in so far as it is indicative of each defendant's personal relationship with each location. Membership is thus not dispositive of standing one way or the other, nor is it even necessarily of any great significance.[28]

#### b. The Defendants' Membership-Security Argument

Turning now to the defendants' "membership-security" argument, the Court recognizes that some courts have considered the elaborate security measures taken by defendants as indicative of an expectation of privacy in a location or item the privacy of which the security measures were designed to secure. In *United States v. Brien,* 617 F.2d 299, 306 (1st Cir.1980), *cert. denied,* 446 U.S. 919, 100 S.Ct. 1854, 64 L.Ed.2d 273 (1980), the Court of Appeals observed that the District Court, in conducting its standing deliberations, properly considered evidence that the particular defendants, both corporate officers, had taken elaborate security precautions designed to limit access to certain areas of their business. The *Brien* court noted that this evidence "established that [the defendants] went to great lengths to keep [their] methods of operation secret," and that their office was a "citadel of security." *Id.* at 306 n. 9. The court also noted, however, that this was merely one of many factors considered by the District Court in reaching the determination that the particular defendants had standing. No where in the *Brien* opinion does the court suggest that this "citadel of security" factor was at all singularly dispositive of the court's standing inquiry, nor even that this factor was the most significant.

Similarly, in *United States v. Allison,* 619 F.2d at 1258–1260, the court considered as relevant to its standing inquiry the fact that two of the defendants, both union officials, posted a twenty-four hour guard to watch the storage area where the incriminating records were kept. Again, however, the *Allison* court does not in any way suggest that elaborate security measures alone are sufficient to confer standing. Indeed, courts have specifically held that the opposite is true—that is that the mere taking of elaborate security precautions is, by itself, insufficient to confer standing. *See Oliver v. United States,* 466 U.S. at 182 n. 13, 104 S.Ct. at 1744 n. 13 ("[c]ertainly the Framers did not intend that the Fourth Amendment should shelter criminal activity wherever persons with criminal intent choose to erect barriers and post 'No Trespassing' signs"); *Rakas v. Illinois,* 439 U.S. at 143 n. 12, 99 S.Ct. at 430 n. 12 ("[o]bviously, however, a 'legit-

---

**28.** Other factors are of much greater significance as indicative of the existence of reasonable expectations of privacy. *See* discussion accompanying note 40, *infra.* An individual may well be an active member of an organization and yet have no cognizable interest in any of the organization's property or possessions.

imate' expectation of privacy by definition means more than a subjective expectation of not being discovered"); *United States v. McHugh,* 769 F.2d at 864 (quoting *United States v. Thornley,* 707 F.2d 622, 624 (1st Cir.1983) ("[f]or fourth amendment purposes, however, 'a legitimate expectation of privacy means more than a subjective expectation of keeping incriminating evidence hidden'"); *United States v. Sarda-Villa,* 760 F.2d at 1236–37 ([d]rug smugglers can not assert standing solely on the basis that they hid the drugs well and hoped that no one would find them"). *See also Mancusi v. DeForte,* 392 U.S. at 367–370, 88 S.Ct. at 2123–2124 (union official held to have standing with regard to items seized from his personal desk area in union offices for a variety of reasons including, but not limited to, the fact that he could reasonably have expected to have been able to exclude others from access to this area).

▇▇▇▇ Again, no single factor is properly dispositive of the Court's standing inquiry. *Rakas v. Illinois,* 439 U.S. at 152, 99 S.Ct. at 435 (Powell, J., concurring). *See United States v. Baron-Mantilla,* 743 F.2d 868, 870 (11th Cir.1984) (mere possession of a key to the premises searched held insufficient to confer standing). And while the security measures taken by each defendant with regard to the locations at issue here are relevant as one factor to consider in determining whether each defendant has standing to challenge the searches and seizures at these locations, they are not conclusive. Consideration of the measures taken by each defendant to ensure his or her privacy forms merely a part of the much larger decisional framework within which the court must work in conducting its standing deliberations. *United States v. Mankani,* 738 F.2d at 544.[29] By relying on the single factor of the type and nature of security precautions taken, the defendants' "membership-security" argument, viewed independently, is insufficient to confer standing on any individ-

ual defendant, let alone collectively on all Macheteros members.

### c. The Defendants' Joint Venture Argument

With regard to the defendants' "joint venture/co-conspirator" standing argument, the Court observes that the defendants rely on a line of cases decided in the Ninth Circuit for the proposition that, because each defendant is an alleged member in a joint-venture (namely the conspiracy to commit the West Hartford robbery) thus each defendant had a reasonable expectation of privacy in locations used by the joint venture in furtherance of the conspiracy. The defendants render this rather straightforward, joint venture theory more complex by discussing their membership in the organization and their alleged participation in the bank robbery conspiracy interchangeably. Thus it would appear that, in addition to arguing 1) that each defendant possesses standing by virtue of the fact that the defendants, as *participants in the conspiracy,* collectively controlled the premises at issue; the defendants also argue concomitantly 2) that each defendant possesses standing by virtue of the fact that the defendants, as *members of the organization,* collectively controlled the very same premises. Thus the defendants appear to assert a kind of dual standing status, with regard to the locations at issue, based upon their separate, overlapping roles as Macheteros members and co-conspirators. *Memorandum of Law in Support of Motion to Suppress Evidence Seized from Calle 21,* filed [on behalf of all defendants and on behalf of defendant Elias Castro Ramos] December 22, 1986, p. 7.

First, to the extent the defendants emphasize membership in the organization as a conclusive basis for standing, the Court must reject this aspect of the defendants' claim, both as an attempted vicarious assertion, and as an attempt to isolate a single characteristic shared by the defendants (mutual membership) as dispositive of the

---

**29.** A defendant may allege that he or she was a member of the organization, and also that he or she generally took elaborate security measures designed to provide security for the organization and its members, and still have failed to allege any relevant factual basis in support of his or her standing claim.

Court's standing inquiry. *See United States v. Allison*, 619 F.2d at 1260 (mere membership in an organization, without more, held insufficient as a basis for standing). It is clear that the extent to which the organization controlled the premises is largely irrelevant: what matters is not the organization's interest in the premises, but the individual's expectation of privacy in those premises. Thus, membership in the organization is pertinent only in so far as it is *evidence* of the individual's expectation of privacy.

▇ Second, to the extent the defendants claim that their status as co-conspirators entitles them to standing, this argument has been specifically rejected by a number of courts, and the Court is persuaded that this aspect of the defendants' claim is unsound. *Alderman v. United States*, 394 U.S. at 171, 89 S.Ct. at 965 (co-conspirators and co-defendants entitled to no special standing status); *United States v. Tortorello*, 533 F.2d 809, 814 n. 5 (2d Cir.1976), *cert. denied*, 429 U.S. 894, 97 S.Ct. 254, 50 L.Ed.2d 177 (1976). However, in the Court's view, status as a co-conspirator retains some significance as a non-dispositive, relevant factor entitled to some weight in the Court's overall standing deliberations.

In addition, to the extent the defendants emphasize their participation in a "joint venture" as talismanic of standing with regard to locations used and collectively controlled by the joint venture, the Court concludes that this argument is indistinguishable from the discredited co-conspirator and membership standing arguments. The use of the term "joint venture" carries with it no special significance, and creates no more of a presumption of standing than do the labels "member" or "co-conspirator." Furthermore, the defendants' joint venture argument has been expressly rejected by a number of courts. As stated in *United States v. Vicknair*, 610 F.2d at 379 (citing *United States v. Dyar*, 574 F.2d 1385, 1390-91 (5th Cir.1978), *cert. denied*, 439 U.S. 982, 99 S.Ct. 570, 58 L.Ed.2d 653 (1978); *United States v. Hunt*, 505 F.2d 931, 939 (5th Cir.1974), *cert. denied*, 421

U.S. 975, 95 S.Ct. 1974, 44 L.Ed.2d 466 (1975)), "[t]he fact that defendants were associated together in an illegal enterprise does not alter the focus of our inquiry. We must look to each defendant's individual privacy ... interest in the premises searched to determine whether the search invaded his substantive Fourth Amendment rights." In *Vicknair*, the Court observed that the area searched, a boat containing contraband, belonged to a straw corporation. The court rejected the argument that the defendants' presence on the boat, even if authorized by the owner, was at all adequate to confer standing. *Id.* at 379. *See United States v. Salvucci*, 448 U.S. at 92, 100 S.Ct. at 2553 (quoting *Rakas v. Illinois*, 439 U.S. at 147-48, 99 S.Ct. at 432) (the mere fact that a defendant was legitimately on the premises is insufficient to confer standing). The court also found that the mere fact that some defendants had keys to the boat, had slept there, and kept belongings there on an intermittent basis was insufficient for standing purposes. *Vicknair*, at 380-381. Similarly in *United States v. Sarda-Villa*, 760 F.2d at 1236, and *United States v. Pinto-Mejia*, 720 F.2d 248, 255 (2d Cir.1983), *modified*, 728 F.2d 142 (2d Cir.1984), the respective courts both held that the mere fact that the defendants were crew members on board the fishing boat and were participants in the smuggling operation was insufficient to confer standing.

Another case, *United States v. Shakur*, 560 F.Supp. 337 (S.D.N.Y.1983), *affd.*, *United States v. Ferguson*, 758 F.2d 843 (2d Cir.1985), *cert. denied*, 474 U.S. 1032, 106 S.Ct. 592, 88 L.Ed.2d 572 (1985), is even more on point. There, the District Court faced an attack on the admissibility of evidence under a remarkably similar set of circumstances. In *Shakur* the court addressed a challenge by one defendant concerning the legality of searches conducted at two "safe houses". The defendant was an alleged member of a communist organization and an alleged participant in various crimes including robbery and conspiracy. *Id.* at 343-45. As a result of evidence seized at the "safe houses", including weapons, ammunition, and bomb para-

phenlia, and as a result of investigation linking the defendant to the organization and conspiracy, the Government secured a warrant for the defendant's arrest and, subsequently, a warrant for a search of her apartment. In seeking the suppression of various items of evidence, the defendant sought to challenge the searches of the two "safe houses". Despite the fact that her fingerprints had been found at these locations, that these locations had been used in furtherance of various conspiracies in which the defendant had participated, and that these locations had been used by the defendant's organization (of which she was an admitted member), the court found that she lacked standing to challenge the legality of the safehouse searches. *Id.* at 345.

The result in *Shakur* clearly belies the defendants' joint venture argument. Nevertheless, the defendants find support for their joint venture standing theory in *United States v. Pollock,* 726 F.2d 1456 (9th Cir.1984). In *Pollock,* the Ninth Circuit stated "a defendant who enters into an arrangement that indicates joint control and supervision of the place searched may challenge a search of the place where contraband is concealed." *Id.* at 1465. The *Pollock* court apparently decided that the joint venture nature of the defendants' concerted drug activities, bolstered by very little else, was sufficient to establish standing. *Id.* at 1465 (standing found on the basis that defendant and others, engaged in the joint venture of producing methamphetamine, had moved their laboratory around from place to place to avoid detection, and that they manufactured the contraband at night to conceal their activities).

As the defendants suggest, the Ninth Circuit has apparently taken a generous view of what is required to demonstrate standing. *See United States v. Broadhurst,* 805 F.2d 849, 851–52 (9th Cir.1986) (approving of joint venture standing); *United States v. Quinn,* 751 F.2d at 981 (9th Cir.1984) (expectation of privacy in boat established in part based on the use of the boat as a joint venture for the purposes of smuggling, and the elaborate precautions taken to keep the contraband concealed in the boat). *See also United States*

*v. Guerrero,* 756 F.2d 1342, 1348 n. 2 (9th Cir.1984), *cert. denied, Booth v. United States,* 469 U.S. 934, 105 S.Ct. 334, 83 L.Ed.2d 270 (1984) (defendant found to have standing with regard to his host's house "by reason of his status as an overnight guest ... when the search occurred"); *United States v. Salvador,* 740 F.2d 752, 755 n. 2 (9th Cir.1984), *cert. denied,* 469 U.S. 1196, 105 S.Ct. 978, 83 L.Ed.2d 980 (1985) (overnight guests found to have standing to challenge the search of their hosts' home where 1) they had visited the location on prior occasions; 2) they had some personal belongings there; 3) they gave their hosts' phone number out as the number where they could be reached; and 4) their child had been babysat there); *United States v. Johns,* 707 F.2d 1093, 1099–1100 (9th Cir.1983), *reversed on other grounds,* 469 U.S. 478, 105 S.Ct. 881, 83 L.Ed.2d 890 (1985) (airplane pilots who owned the contraband but who dropped it off and then departed had standing to object to later search of truck carrying the contraband); *United States v. Perez,* 689 F.2d 1336, 1338 (9th Cir.1982) (defendants in car who followed truck containing contraband, and who owned the contraband, and who hired the truck which they followed, had reasonable expectation of privacy in truck); *United States v. Robertson,* 606 F.2d 853, 858 n. 2 (9th Cir.1979) (defendant had standing to challenge search of a friend's residence where he was an overnight guest, kept possessions, and had an interest in the items seized). *Compare these cases with United States v. Jimenez,* 789 F.2d 167, 170 (2d Cir.1986) (defendant lacked standing with regard to apartment where, although he had access to the premises and some of his possessions were seized from the location, his access was only occasional); *United States v. Rackley,* 742 F.2d 1266, 1270 (11th Cir.1984) (defendant lacked standing with regard to search of host's home despite fact that he possessed a key, stayed overnight on several occasions, and kept some belongings there); *United States v. Adamo,* 742 F.2d 927, 947 (6th Cir.1984), *cert. denied,* 469 U.S. 1193, 105 S.Ct. 971, 83 L.Ed.2d 975 (1985) (party

guest lacked a reasonable expectation of privacy in host's home); *United States v. Garcia*, 741 F.2d at 366 (11th Cir.1984) (defendant lacked standing where he failed to demonstrate that his contacts with the apartment were "regular or personal enough" despite control of the premises, his presence at the time of its search, and his use of the apartment by appointment to conduct his cocaine trade); *United States v. Mankani*, 738 F.2d at 545 (2d Cir.1984) (despite the fact that the defendants lived in rooms in the house, they had no expectation of privacy in the barn where they neither resided, nor kept personal belongings, and only visited periodically); *United States v. Robinson*, 698 F.2d 448, 454–55 (D.C.Cir.1983) (defendant lacked standing with regard to host's home where others entered the premises freely); *United States v. Meyer*, 656 F.2d 979, 981 (5th Cir.1981), *cert. denied*, 465 U.S. 1065, 104 S.Ct. 1413, 79 L.Ed.2d 739 (1984) (guest had no expectation of privacy in hosts' bathroom cabinet); *United States v. Reyes*, 595 F.2d 275, 278–79 (5th Cir.1979) (defendants who were mere passengers in a private aircraft lacked a sufficient expectation of privacy to object to its search); *United States v. Cella*, 568 F.2d 1266, 1283 (9th Cir.1977) (defendant lacked standing to challenge the search of the corporation's print shop, even though he was a corporate officer and had access to and control of the print shop, where he failed to show that he spent a considerable amount of time there or that his expectation of privacy extended to particular documents kept at the shop); *United States v. Britt*, 508 F.2d 1052, 1055 (5th Cir.1975), *cert. denied*, 423 U.S. 825, 96 S.Ct. 40, 46 L.Ed.2d 42 (1975) (president of corporation lacked standing with regard to corporate documents not personally prepared by him and which were kept in a storage area at which location the president did not spend a considerable amount of time).

Joint venture standing has not escaped criticism however, even in the Ninth Circuit. Judge Sneed, dissenting in *Quinn*, disagreed with the Court's approach, arguing that mere ownership and participation in a joint venture is insufficient to confer standing. *Quinn*, at 981–82. In addition, the dissent points out the need to critically examine not only whether the defendant had a subjective expectation of privacy, but also whether such an expectation, viewed objectively, is one society is prepared to accept as reasonable.

As suggested by the *Quinn* dissent, the *Pollock* joint venture rationale stands in stark contrast to prevailing Fourth Amendment norms. *See e.g. United States v. McHugh*, 769 F.2d at 864; *United States v. Sarda-Villa*, 760 F.2d at 1236–37; *United States v. Pinto-Mejia*, 720 F.2d at 255 (2d Cir.1983); *United States v. Vicknair*, 610 F.2d at 379 (5th Cir.1980).[30] Each of these cases confirms that the defendants' joint attempt to maintain the secrecy of their activities is not, by itself, sufficient to confer standing. *Vicknair* specifically requires that each defendant "must rest upon his own justifiable expectations to establish a zone of privacy" in the place searched or items seized, *id.* at 380, and expressly rejects the proposition that any particular defendant can boot-strap himself into a position of standing on the basis that one or more of his or her co-conspirators possesses a legitimate expectation of privacy. *See Alderman v. United States*, 394 U.S. at

**30.** A review of the cases reveals that the Ninth Circuit stands by itself in its willingness to accept the viability of joint-venture standing. When discussing standing issues, other circuits have typically required each defendant to demonstrate a more involved, personal relationship with the location or item as an adequate basis for his or her claim. The Court has expressly adopted this latter approach, as articulated in the Fifth Circuit's analysis undertaken in *United States v. Vicknair*, 610 F.2d 372, 379 (5th Cir. 1980). The Court finds that its standard more accurately embodies the Supreme Court's re-peated refusal to permit one defendant to assert the privacy expectations of others. *United States v. Salvucci*, 448 U.S. at 86, 100 S.Ct. at 2550 (citing *Alderman v. United States*, 394 U.S. at 174, 89 S.Ct. at 966; *Brown v. United States*, 411 U.S. at 230, 93 S.Ct. at 1569). *See United States v. Payner*, 447 U.S. 727, 731, 100 S.Ct. 2439, 2444, 65 L.Ed.2d 468 (1980) ("the defendant's Fourth Amendment rights are violated only when the challenged conduct invaded *his* legitimate expectation of privacy rather than that of a third party").

171–172, 89 S.Ct. at 965 ("[c]o-conspirators and codefendants have been accorded no special standing"); *United States v. Galante,* 547 F.2d 733, 739 (2d Cir.1976), *cert. denied,* 431 U.S. 969, 97 S.Ct. 2930, 53 L.Ed.2d 1066 (1977) ("a co-conspirator or co-defendant obtains no special rights in this respect"); *United States v. Hodge,* 539 F.2d 898, 902 (6th Cir.1976), *cert. denied,* 429 U.S. 1091, 97 S.Ct. 1100, 51 L.Ed.2d 536 (1977) (no special status accorded to co-conspirators or codefendants). *See also Rakas v. Illinois,* 439 U.S. at 132–33, 99 S.Ct. at 424 ("target theory" of standing rejected). The Court finds that, despite the generosity of the *Pollock* approach, the weight of authority supports the analysis undertaken in *Vicknair,* and the Court expressly adopts it with the following elaborations.

### d. The Defendants' Overall Collective Standing Theory

 Viewing the defendants' standing theories collectively, the Court observes that the defendants' overall theory attempts to focus the Court's inquiry on an exceedingly narrow range of factors (membership, security measures, and joint venture status) as dispositive of the issues presented. However, as courts have continuously stated, no single factor, or even a small range of factors, is properly considered as controlling to the exclusion of all else: not mere ownership, *United States v. Fahnbulleh,* 748 F.2d 473, 477 (8th Cir. 1984), *cert. denied,* 471 U.S. 1139, 105 S.Ct. 2685, 86 L.Ed.2d 702 (1985), even when coupled with possession, *United States v. McHugh,* 769 F.2d at 864 (quoting *United States v. Goshorn,* 628 F.2d 697, 701 (1st Cir.1980)); not merely the defendant's legitimate presence on the premises at the time of the search, *Rakas v. Illinois,* 439 U.S. at 147–48, 99 S.Ct. at 432; *United States v. Sarda-Villa,* 760 F.2d at 1236 (citing *United States v. Hensel,* 672 F.2d 578, 579 (6th Cir.1982), *cert. denied,* 471 U.S. 1139, 105 S.Ct. 2685, 86 L.Ed.2d 702 (1985); nor that the defendant resided at

the location, *United States v. Briones-Garza,* 680 F.2d at 421 (5th Cir.1982); not merely that the defendant is a co-defendant or co-conspirator with others who possess standing, *Alderman v. United States,* 394 U.S. at 172, 89 S.Ct. at 965; nor merely that the defendant is a corporate officer of the corporation that controls the place searched or item seized, *United States v. Bush,* 582 F.2d 1016, 1019 (5th Cir.1978); *United States v. Cella,* 568 F.2d at 1283; nor a mere union member, *United States v. Allison,* 619 F.2d at 1260; nor an employee, *Babula v. Immigration & Naturalization Service,* 665 F.2d at 297; nor a crewmember of a ship, *United States v. Sarda-Villa,* 760 F.2d at 1236; nor even that the defendant was the target of the search, *Rakas v. Illinois,* 439 U.S. at 132–33, 99 S.Ct. at 424. *See O'Connor v. Ortega,* 107 S.Ct. at 1497 (opinion of O'Connor, J.) ("[w]e have no talisman that determines in all cases those privacy expectations that society is prepared to accept as reasonable"). A court is obliged to conduct its inquiry from a broader perspective, and must consider all relevant factors, not just the few the defendants present as dispositive.

 The Court also observes that the defendants' attempt to isolate single factors of alleged significance and proclaim them as entitled to Fourth Amendment protection must be rejected 1) as an attempt to assert automatic standing, and 2) as an attempt to by-pass the Supreme Court's two-part standing test. With regard to the first concern, a claim that any particular characteristic or particular group of characteristics is controlling is tantamount to a claim that anyone possessing such characteristic(s) is entitled to standing. This approach has been specifically rejected by the Supreme Court in *United States v. Salvucci.* 448 U.S. at 85, 100 S.Ct. at 2549.[31] With regard to the second concern, the Court rejects the defendants' implicit assertion that the Court should confer standing

---

**31.** While the defendants' claims are not equivalent to *the* automatic standing rule rejected in *Salvucci* (rejecting the particular automatic standing rule enunciated in *Jones*), their standard, if accepted, would permit standing where

strict application of the Supreme Court's test would not. This would clearly amount to an unacceptable erosion of the Court's two-part test.

on the basis of the narrow inquiry they suggest. A defendant is not permitted to so lightly cast aside his or her burden of establishing a legitimate expectation of privacy in the location searched or item seized. The defendant must first establish the existence of a subjective expectation of privacy. It is then for the Court to decide whether this expectation is reasonable on the basis of the defendant's allegations and proof. *United States v. McHugh*, 769 F.2d at 864. An attempt to claim that any particular interest is dispositive of the standing issue is to say that the defendant's subjective expectation is per se reasonable. As the Supreme Court has so aptly stated, courts must avoid the mere recitation and approval of a given defendant's subjective privacy expectations " 'without examining the desirability of saddling them upon society.' " *Hudson v. Palmer*, 468 U.S. at 525 n. 7, 104 S.Ct. at 3199 n. 7 (quoting *United States v. White*, 401 U.S. 745, 786, 91 S.Ct. 1122, 1143, 28 L.Ed.2d 453 (1971) (Harlan, J., dissenting)). Thus, the Court finds that there can be no automatic standing rule for joint venture defendants, and, following the reasoning of *Vicknair*, and of other cases in accord with it, the Court declines to extend the ruling in *Pollock* to the present controversy.

## D. Specific Analysis of the Defendants' Standing Claims

▮ A fundamental conclusion to be drawn from the foregoing analysis is this: in determining whether any given defendant possesses a legitimate expectation of privacy in a particular place searched or item seized, a court must focus its inquiry on the personal privacy expectations of the individual rather than on those of the group. To accomplish this, a court must concern itself with the specifics of the individual's relationship to the location or item, rather than with the collective relationship professed by the organization. This is necessarily so given that the Fourth Amendment protects personal privacy interests which may not be vicariously asserted. Again, this does not mean that such factors as membership and shared ideas concerning privacy (as exhibited by elaborate security measures and extreme precaution) are irrelevant. It simply means that such must be taken into account as merely one facet of an individual's overall privacy perspective. As far as the Fourth Amendment is concerned, the group's interests do not completely define the individual's expectations. It is for the individual to define them for him or herself. Here, it is simply not enough to say, in the face of the Government's objection, "that the defendants maintained the premises in question ... for the purpose of providing them with a private location in which to store items which they wished to keep confidential" as an adequate basis for standing. *Supplemental Memorandum of Defendant Jorge Farinacci Garcia*, dated February 17, 1987, p. 7. *See United States v. Galante*, 547 F.2d at 739 ("[t]he mere fact that [the defendants] chose to warehouse their merchandise [on the premises at issue] will not confer standing on them").[32] The Court is thus unwilling to accept the defendants' blanket standing assertions without examining each individual defendant's personal relationship to the locations searched and items seized. With this overall understanding firmly in place, the Court turns to the specifics of each defendant's individual standing claim.

The Court begins this final stage of its analysis with the observation that the defendants' efforts to establish the validity of their standing claims under the Fourth Amendment is seriously hampered by the manner in which they submit their standing allegations. The defendants (with the exception of Ojeda Rios) do not, in fact, allege anything for themselves. Rather they typically rely on various averments the Government has made in numerous contexts (e.g. factual claims set forth in affidavits sup-

---

**32.** *Compare Galante with United States v. Moscatiello*, 771 F.2d 589, 601 (1st Cir.1985), *vacated*, —— U.S. ——, 106 S.Ct. 2241, 90 L.Ed.2d 688 (1986) (defendants found to have standing in warehouse where 1) they had a proprietary interest in the warehouse; 2) each had a key to the premises; 3) only a very limited number of people (three) had access to the location; and 4) they kept personal belongings there).

porting various search warrants) to establish their standing to challenge the searches and seizures conducted at various locations. To the extent that these assertions are also incriminating, the defendants generally, but not consistently, claim that they do not contest them for the purposes of the Court's standing deliberations. The Court observes, however, that, while it is true that the defendants may rely on facts established by the Government to support their standing claims, this does not in any way relieve them of their Fourth Amendment burdens. *See United States v. Gomez,* 770 F.2d at 253 (failure to present evidence of standing by the date required by Rule 12(b)(3) was defendant's failure, not the Government's—defendant had the burden of establishing standing); *United States v. Robinson,* 698 F.2d at 454–55 (suggesting that counsel's failure to introduce evidence sufficient to form an adequate basis for a legitimate standing claim was his own fault and served as a proper basis for a denial of standing).

The defendants' filings are not aided by their refusal to admit what they do not deny, nor by their inability or unwillingness to elaborate on the Government's "facts." In addition, certain defense counsel specifically deny certain of the specific averments they rely on to establish standing. Counsel for defendant Hilton Fernandez Diamante states that he categorically denies that his client was a member of the Macheteros organization, or that he kept anything at the Ponce de Leon premises. This denial occurs literally within the same breath in which counsel also claims standing with regard to this location. *Transcript of Proceedings of April 8, 1987,* pp. 15–16 (remarks of Attorney Williams). In his affidavit, defendant Hilton Fernandez specifically relies on the Government's averments that he was a member of Los Macheteros and that he kept personal records at the Ponce de Leon premises. *Affidavit Regarding Standing of Defendant,* filed [on behalf of defendant Hilton Fernandez Diamante] February 17, 1987, p. 7. This inconsistency leaves the defendant in somewhat of an ambiguous and precarious factual position.

The Court has ordered each defendant to particularize the specific allegations which support his or her standing claims. A reliance on various Government assertions, which may or may not be true, and which in any event are categorically denied by the defendant, hardly satisfies his or her burden of creating the impression that he or she held a *subjective* expectation of privacy in the particular location searched or item seized, let alone that this expectation, viewed objectively, was reasonable. An admission of facts for the purposes of standing is inadmissable at trial on the issue of guilt. *Simmons v. United States,* 390 U.S. at 394, 88 S.Ct. at 976. The Supreme Court specifically granted such immunity to afford defendants the full opportunity to assert such facts without presenting to them a Hobson's choice between demonstrating an adequate factual basis for standing purposes (which might include incriminating admissions) and exercising other important rights, including the right against self-incrimination. The Court can only speculate as to why the defendants have pursued their standing claims through reliance on information disclosed by the Government rather than on their own personal, first-hand information. However, the Court concludes 1) that, to the extent the defendants' standing submissions reflect an inability to make detailed factual allegations, this demonstrates an inability to meet their Fourth Amendment burdens; and, 2) to the extent the defendants' submissions reflect an unwillingness to make detailed factual allegations, this is inexcusable in the face of two court orders requiring the defendants to so allege the specific factual foundations for their standing claims.

Defendants, not the Government, are in the best position to apprise the Court of the legitimate basis for their standing allegations. Indeed it is their duty to do so. For the purposes of establishing the existence of a subjective expectation of privacy (let alone the reasonableness of this expectation), reliance on what the Government believes to be true is a poor substitute for factual averments that fully set forth what

a particular defendant believes to be the facts of his or her case.

■ The defendants cannot argue that they have no information of their own. Surely each defendant is capable of detailing the precise relationship he or she had with each location at issue.[33] The defendants cannot be heard to blame the Government for their inability to establish standing, or, alternatively, for their unwillingness to allege relevant facts. First of all, the Government long ago disclosed which of the many evidentiary items seized it intends to use in its case-in-chief. The Government long ago made its Rule 16 disclosures. In addition, the Government has created and disclosed, among other things, an index describing particular items seized from the Ponce de Leon premises, and the Title III logs regarding the El Centro condominium. Furthermore, the defendants have been provided the ongoing opportunity to review each item seized from the Ponce de Leon location for themselves. Secondly, even if the Government had not yet done these things, the defendants, if they indeed possessed a legitimate basis for their standing allegations, should still have been able to submit adequate factual assertions from their own personal knowledge. Instead, the defendants typically insist on relying on the Government's broad allegations, rather than their own detailed assertions, to support their standing arguments.

The Court proceeds with consideration of the submitted materials. However, to the extent reliance on Government averments is inadequate to substantiate the defendants' conclusory standing claims, and to the extent the defendants fail to bolster the Government's assertions with their own adequate factual foundations, the Court concludes that the defendants' standing to challenge the various searches and seizures at issue here must be denied.

### 1. The Sufficiency of the Defendants' Allegations Regarding their Professed Subjective Expectations

The Court first addresses the defendants' claims under the first prong of the Supreme Court's standing test. Here the Court seeks to determine whether the defendants' submissions adequately allege that they sought to preserve the locations as private including 1) whether the individual defendant's factual allegations (including information the defendant relies on from sources other than him or herself) reasonably create the impression that he or she had a significant and personal privacy interest in each location and its contents; and 2) whether such interest or effort was contemporaneous with the search.[34]

It is clear that the organization and its members hoped that the three locations at issue would remain secure from outside intrusion and interference. It is also clear that the defendants at times took precautionary measures designed to preserve the secrecy and anonymity of their activities. Examples include the fact that the defendants used aliases to hide their identities; used deliberately circuitous routes to reach destinations; used code names in their conversations; and avoided surveillance of their activities through the use of disguises and other means. However, no defendant, with the exception of Ojeda Rios, has detailed with *any* degree of specificity exactly how any specific action he or she undertook had the direct result of preserving any of the three locations as private. No defendant has claimed that he or she guarded, or arranged guard service for, any of these locations. No defendant, with the exception of Ojeda Rios in connection with the Ponce de Leon premises, has alleged that he or she saw to it that the locations

---

**33.** Defendants need look no further than to the efforts of their co-defendant Filiberto Ojeda Rios. The Court finds that his affidavit with regard to his alleged interests in the Ponce de Leon premises reasonable establishes a colorable claim of subjective interest sufficient to permit him to proceed to a hearing to establish the credibility of his claims.

**34.** Among the difficulties that exist with regard to defendant Ojeda's allegations are that he has not claimed, or pointed to evidence that establishes, that his interest in the Ponce de Leon location was contemporaneous with the search.

were locked.[35] No defendant, with the exception of Ojeda Rios, claims to have possessed a key to any of these places. No defendant states that he or she, by virtue of his or her position in the organization, had the authority to secure the premises from outside interference.[36] Furthermore, no defendant, with the exception of Ojeda Rios, distinguishes his or her privacy interest in any of these locations from that of any of the other defendants in this case. The Court finds that the defendants' submissions, accepted at face value, establish that they subjectively believed that the locations would remain private, but not that any particular defendant actually sought to maintain the locations as private in any specific, identifiable manner.[37]

Likewise, the defendants' submissions (with the possible exception of Ojeda Rios' submissions offered in connection with the Ponce de Leon location) do not properly establish a claim that each individual's interests in the locations were personal in nature, let alone significant. First, the defendants seek to establish standing by arguing that the use of the locations in a joint venture capacity confers standing on each participant with regard to each location used by the group. Second, the defendants do not rely on allegations that suggest that their involvement with the locations was not merely derivative of a group interest.[38] The Court is only able to conclude from this that each defendant may have had a close relationship with the organization. The Court is unable to find, even assuming that each of the assertions on which the defendants rely is true, that each or any defendant had a close personal relationship with the Ponce de Leon premises, the El Centro Condominium, or Apartment 1012A.

And finally, the defendants do not typically allege or rely on averments that suggest that each defendant's professed interest in each of the locations was in fact contemporaneous with its search. No defendant asserts that he or she *ever* visited the Ponce de Leon location or Apartment 1012A. Only four defendants' conversations were overheard at the El Centro condominium in the months prior to its search. Furthermore, the evidence suggests that, due to the fragmentation of the organization, only a limited number of defendants would even have been likely to have visited the condominium. In the absence of specific claims to the contrary, the Court is unable to conclude that any of the others retained a significant interest in the condominium at the time of its search. *See United States v. Potter*, 419 F.Supp. 1151, 1155 (N.D.Ill.1976), *affd.*, 567 F.2d 392 (7th Cir.1977), *cert. denied, Hopson v. United States*, 436 U.S. 914, 98 S.Ct. 2256, 56 L.Ed.2d 415 (1978) (the "mere association with an organization which makes use of certain property ... should not entitle an individual to an expectation of privacy in a situs which he personally never used and of which he may well have been oblivious").

■ Having reviewed the defendants' claims under the subjective interest prong of the Supreme Court's standing test, the Court finds that the defendants have failed to allege an adequate basis on which the Court could conclude that they, in fact, did

---

**35.** Defendant Ojeda claims that he kept the the Ponce de Leon premises locked at all times, and that he possessed the key. *Affidavit*, at 1.

**36.** Defendant Ojeda claims that he was responsible for operating the Ponce de Leon premises. He also states that he was responsible for "access" to the premises "in order to avoid its detection and thereby to protect the integrity of its contents." *Affidavit*, at 2.

**37.** Defendant Ojeda has likewise failed to allege particular concrete examples of how he provided for the Ponce de Leon location's security other than that he possessed a key and kept the door locked. His allegations are distinguishable, however, from those of the other defend-

ants in that he at least personally alleges this much.

**38.** The defendants rely on various assertions made by the Government that establish that each was a member of the group. The defendants do not, however, present details regarding the exact relationship he or she had with each location. By characterizing their claims as suggestive of joint venture standing, and by relying on averments that establish this characterization, the defendants fail to allege facts essential to establish that each had a significant, personal relationship with each location.

attempt to maintain the Ponce de Leon premises, the El Centro condominium, and Apartment 1012A as private in any personally significant manner at the time of the searches. However, the Court need not rest alone on its conclusion that the defendants' offerings are fatally deficient under the subjective interest prong because, with one exception, the Court also finds that their allegations are clearly not "reasonable" under the second prong of the Supreme Court's test.

## 2. The Objective Reasonableness of the Defendants' Claims

Even assuming that each defendant's allegations establish a proper claim of subjective interest, the Court concludes that, viewed objectively, the defendants' professed privacy expectations (with the one noted exception) cannot possibly be classified as "reasonable" within the meaning of the Fourth Amendment.[39] With the exception of defendant Ojeda's claim (made with regard to the Ponce de Leon safehouse), the defendants' allegations, viewed in consideration of the totality of the circumstances, fail to create the impression that their professed interests in any of the locations at issue were, in significant respects, of a quality similar in nature to legitimate expectations of privacy one would normally expect an individual to have with regard to his or her home and its contents. At best, the defendants' allegations establish no more than that they attempted to conceal their activities in the hope that no one would find out what they were up to. This type of claim, without more, is clearly inadequate to confer standing. *Oliver v. United States,* 466 U.S. at 182 n. 13, 104 S.Ct. at 1744 n. 13; *Rakas v. Illinois,* 439 U.S. at 143 n. 12, 99 S.Ct. at 430 n. 12.

In reaching its conclusion, the Court has examined each defendant's claim for the existence of certain key factors that courts have routinely looked for to determine the objective reasonableness of a given defendant's professed expectation. Such badges of reasonableness, while not talismanic, have enabled courts to examine the components of any given subjective expectation in a coherent manner, and have enabled courts to compare facets of the professed expectation with certain key components of expectations that have been found to be reasonable in the past.[40] Such factors include 1) ownership of or other conventional property interests in the premises or its contents; 2) use of the location as a residence; 3) use of the premises on a regular basis for professional, political, religious, or business purposes; 4) presence at the time of the search, or at other times; 5) security measures undertaken by the defendant to ensure the privacy of the particular area searched; 6) a defendant's authority over the premises; 7) a defendant's ability or right to exclude others from the area; 8) use of the particular location as a repository for the defendant's personal belongings; 9) a defendant's subjective expectation that the premises would remain free from Government intrusion; and 10) whether any of the defendant's interests or efforts taken to ensure privacy were in existence or were undertaken at the time of the search or seizure. *Rawlings v. Kentucky,* 448 U.S. at 104–106, 100 S.Ct. at 2561–62; *Rakas v. Illinois,* 439 U.S. at 143 n. 12, 99 S.Ct. at 430 n. 12; *id.* at 150–53, 99 S.Ct. at 434–35 (Powell, J., concurring); *United States v. Brien,* 617 F.2d at 306 (1st Cir.1980); *United States v. Broadhurst,* 612 F.Supp. 777, 784–85 (E.D.Cal.1985), *revd. on other*

**39.** Defendant Ojeda's subjective interest in the Ponce de Leon location, as set forth in his affidavit, may, in fact, be reasonable. However, the defendant has yet to prove his allegations. Furthermore, at this point, the defendant has not alleged enough information for the Court to conclude that, even if his allegations are correct, that his interest in the location was of a quality significantly similar to expectations of privacy that have been found in the past to be protected by the Fourth Amendment.

**40.** The Court does not mean to say that it is prepared to consider only such standing factors as have come to light in previous cases. The only unwillingness expressed by the Court is the unwillingness to find any single factor, or any improperly narrow range of factors, as dispositive of the Court's standing inquiry.

*grounds,* 805 F.2d 849 (9th Cir.1986). The Court by no means intends to suggest that this is an exhaustive list of relevant factors. The Court reiterates that each defendant's overall claim must be reviewed in light of all the circumstances that tend to either prove or disprove the reasonableness of his or her professed expectation of privacy. With this in mind, the Court turns to consideration of the various facets of each defendant's standing claim.

The Court observes that, with the possible exception of defendant Ojeda,[41] no defendant claims ownership or any other conventional property interest in any of the locations at issue, let alone their contents.[42] "While a person may have a legitimate expectation of privacy in a place or object he does not own," *United States v. Reyes,* 595 F.2d at 278, ownership interests are indeed among the most significant interests an individual can assert in support of his or her standing claim. *Rakas v. Illinois,* 439 U.S. at 144 n. 12, 99 S.Ct. 430 n. 12; *id.* at 153, 99 S.Ct. at 435 (Powell, J., concurring). *See United States v. Freire,* 710 F.2d 1515, 1519 (11th Cir.1983), *cert. denied,* 465 U.S. 1023, 104 S.Ct. 1277, 79 L.Ed.2d 681 (1984) (while ownership by itself is not talismanic of reasonableness, "[i]t is, nevertheless, a bright star by which courts are guided when the place invaded enjoys universal acceptance as a haven of privacy, such as one's home"). The fact that the defendants do not claim any conventional property or proprietary interests in the locations, or their contents, however, simply means that they must rely on other professed interests to substantiate their assertions of standing. *See United States v. Salvucci,* 448 U.S. at 91, 100 S.Ct. at 2553 ("[w]hile property ownership is clearly a factor to be considered in determining whether an individual's Fourth Amendment rights have

been violated ..., property rights are neither the beginning nor the end of this Court's inquiry"); *United States v. Manbeck,* 744 F.2d at 374 ("[a]t most, an interest in the items found may be a factor considered when deciding whether there is a privacy interest in the area searched").

Moving down the list, the Court also observes that no defendant claims that he or she resided at either the Ponce de Leon location, the El Centro Condominium, or Apartment 1012A. While not talismanic, residence, perhaps even more so than ownership, is one of the most significant indicia of the reasonableness of a professed expectation. Again, however, the fact that no defendant claims to have resided at any of these locations simply means that they must rely on other professed interests to support their standing claims. *United States v. Briones-Garza,* 680 F.2d at 421 (citing *United States v. Haydel,* 649 F.2d 1152, 1154 (5th Cir.1981), *corrected,* 664 F.2d 84 (5th Cir.1981), *cert. denied,* 455 U.S. 1022, 102 S.Ct. 1721, 72 L.Ed.2d 140 (1982) ("[w]hile residence may often be an important consideration, it is not talismanic").

Similarly, no defendant claims to have used the Ponce de Leon premises, the El Centro condominium, or Apartment 1012A on a regular basis for professional, religious, or business purposes. The defendants' submissions, including information gathered from the Government's averments on which they claim to rely, establishes that the defendants used these locations for illegal terrorist purposes. Some defendants, however, also claim that the organization used these locations to pursue legitimate political activities.[43] These defendants do not, however, identify the nature of these alleged activities, or even

---

**41.** *See* note 11, *supra.*

**42.** *See* note 11, *supra.*

**43.** *See e.g. Affidavit Regarding "Standing" of Defendant Elias Castro-Ramos,* dated February 16, 1987, p. 4 ("[t]he activities allegedly conducted by Los Macheteros include legal, protected political activities"); *Affidavit in Support of Motions*

*to Suppress,* filed [on behalf of defendant Antonio Camacho Negron] February 17, 1987, p. 3 ("[t]he documents recovered at the locations described above reflect lawful, protected political activity by the organization and its individual members as well as illegal [violent] acts undertaken in pursuit of independence for Puerto Rico").

describe them.[44] They do not identify how they collectively, or individually, used these locations to pursue these unidentified activities. The Court is thus unable to conclude that any defendant has properly claimed that he or she personally used the Ponce de Leon premises, the condominium, or Apartment 1012A for legitimate political purposes on a regular basis, and that any reasonable expectation of privacy is properly alleged thereby. The Court does find, however, that the fact that some defendants used the premises periodically to pursue their illegal terrorist activities is far insufficient to establish the reasonableness of their professed privacy expectations. *See United States v. Garcia,* 741 F.2d at 366 (defendant lacked standing where he failed to demonstrate that his contacts with the apartment were "regular or personal enough" despite control of the premises, his presence at the time of the search, and his use of the apartment by appointment to conduct his cocaine trade).

The Court also observes that no defendant was present at any of the locations at issue at the time of its search. In addition, no defendant, with certain exceptions, has personally alleged that he or she ever visited any of these places, let alone provide examples of the frequency, duration, and nature of his or her visits. While it is true that Government overhears at the El Centro condominium place four defendants at this location on several occasions, this same evidence establishes that these defendants' visits were sporadic and of brief duration. The defendants have not supplemented this information with any specific claims of their own. Nothing is clearer but that a defendant's legitimate presence at a location at various times is insufficient to establish the reasonableness of his or her professed privacy expectations in that location. *See United States v. Salvucci,* 448 U.S. at 92, 100 S.Ct. at 2553 (quoting *Rakas v. Illinois,* 439 U.S. at 147–48, 99 S.Ct. at 432) (the mere fact that a defendant was legitimately on the premises is insufficient to confer standing).

The Court has previously discussed the defendants' claims that they undertook various security endeavors designed to preserve their privacy and anonymity. The Court concludes that such measures as the defendants claim to have undertaken, or, more properly, such measures as certain Government averments allege the defendants undertook and on which the defendants claim to rely, do not establish that any particular defendant, with the possible exception of defendant Ojeda, had colorable authority or responsibility to safeguard the locations at issue; actively exercised such authority in any particular, identifiable manner with specific reference to any of the locations at issue; or, by such action, sought to preserve as private items in these locations in which he or she had a particular, identifiable possessory, proprietary, or otherwise legitimate interest.[45] Thus, the alleged security precautions advanced by the defendants fail to lend much support in terms of establishing the purported reasonableness of their professed expectations.

■ With the exception of defendant Ojeda, no defendant has detailed the precise nature of his or her alleged responsibilities with regard to either the Ponce de Leon premises, the El Centro condominium, or Apartment 1012A.[46] Some defendants

44. Defendant Ojeda does indicate that he used the Ponce de Leon premises for the purpose of collecting information relevant to the independence movement in Puerto Rico. Defendant Ojeda has not suggested, however, that this constitutes protected political activity.

45. The exception to this finding is, of course, defendant Ojeda, who has alleged with some particularity how he attempted to maintain the privacy of the Ponce de Leon premises.

46. Defendant Isaac Camacho Negron relies on the Government's averment that he was at some point the treasurer of the organization, and that some of the documents seized at the Ponce de Leon and El Centro safehouses were financial records of the organization which he prepared. The defendant has failed to allege, however, that he retained any control or interest over these documents; that they were kept in a location over which he retained some responsibility or authority; or even that he was the treasurer of the organization at the times when these locations were searched. Indeed, the defendant relies on the allegation that these documents were prepared for the organization, rather than for

have relied on the Government's averments to establish that they were, in fact, leading members of the organization. However, no defendant has defined how his or her status as a member, or leading member, carried with it particular responsibility over any of the premises, or even over any of the various items seized. Likewise, no defendant has detailed how his or her position carried with it particular authority to exclude anyone else from any of the "safehouses". The Court concludes that the defendants' submissions do not advance their reasonableness claims with regard to consideration of the nature of each defendant's responsibilities in the organization or his or her ability or right to exclude others from access to areas over which he or she claims to have had a particular expectation of privacy. *See United States v. Porter*, 701 F.2d 1158, 1165 (6th Cir.1983), *cert. denied*, 464 U.S. 1007, 104 S.Ct. 524, 78 L.Ed.2d 708 (1983) (defendant found to lack standing with regard to airplane hangar, notwithstanding his regular use of it and the fact that he placed a lock on its entrance, where he was given no control over the hangar and it was used by others to store their property as well).

Similarly, no defendant claims to have used the premises as a repository for personal belongings.[47] First, no defendant claims personal ownership of any of the items seized at any of the locations at issue, or even that he or she had the right to store his or her personal belongings there. Second, the defendants rely on the Government's characterization of the locations as secure areas used for the storage of organizational, rather than personal, materials. And third, the Government's submissions, on which the defendants claim to rely, specifically state that the safehouses were not typically used for personal purposes. In the absence of any claim that specific items seized at any of these locations belonged to any particular defendant, the Court concludes that neither the Ponce de Leon premises, the El Centro condominium, or Apartment 1012A served as a personal repository for any defendant's personal possessions.

It is clear that the defendants had the subjective expectation that these locations would remain free from Government intrusion. This is by far the strongest of the defendants' claims. However, this factor alone cannot establish the reasonableness of the defendants' subjective expectations. *See Hudson v. Palmer*, 468 U.S. at 525 n. 7, 104 S.Ct. at 3199 n. 7 (the Court's standing analysis must "transcend the search

---

himself. In addition, to the extent that the documents belonged to the organization and were kept in a common group access location (rather than personal documents kept in a personal file, or even organizational documents kept in a personal file) his personal expectations with regard to these documents, and to the locations from which they were seized, are critically diminished. His allegations with regard to his position as treasurer thus add little to his overall privacy claim. *United States v. Bush*, 582 F.2d at 1019; *United States v. Cella*, 568 F.2d at 1283. *See United States v. Britt*, 508 F.2d at 1055 (standing denied to a corporate officer who lacked significant personal ties to the items seized). The defendant's overall claim amounts to no more than an assertion that he prepared some of the organization's financial documents and the that the group stored then at certain locations with the expectation that they would remain secret. This is completely inadequate to serve as a proper basis for standing. *United States v. McHugh*, 769 F.2d at 864 (quoting *United States v. Thornley*, 707 F.2d at 624).

Other defendants have alleged that they held leadership positions in the organization. With the possible exception of defendant Ojeda, none have detailed how such status advances their professed expectations of privacy. The cases referred to in the preceeding paragraph demonstrate that defendants who merely assert that they held important positions in an organization without detailing the precise nature of their relationship to the specific locations or items at issue, and without detailing how their authority extended to these locations or items in a significant manner, are not entitled to standing with regard to those particular locations or items. Status alone, without more, is insufficient to confer standing.

**47.** Defendant Hilton Fernandez Diamante relies on the Government's assertion that a number of his personal records were seized from the Ponce de Leon location. He does not claim, however, that he used the location as a repository for his personal belongings. In fact he appears to disclaim such use. *See* note 11, *supra.*

It is unclear whether defendant Ojeda claims that he used the Ponce de Leon location as a personal repository. *See* note 11, *supra,* and discussion in Section D–3 in text, *infra.*

for subjective expectations" and must examine "the desirability of saddling [the defendants' expectations] upon society"). Indeed, all that the existence of this factor accomplishes is to demonstrate that the defendants wished to keep their exploits a secret. This alone is far from adequate to demonstrate standing.

The Court has previously discussed whether each defendant's professed interests existed contemporaneously with the various searches and seizures at issue. To the extent a given defendant's expectations were not reasonably contemporaneous, then the expectation cannot be reasonable. *See United States v. Coleman,* 450 F.Supp. 433, 436–37 (E.D.Mich.1978) ("the focus of inquiry in on the question of whether at the time of the search and/or seizure the defendant had a reasonable expectation of privacy in the area searched"). However, given that the defendants have otherwise failed to meet their burden of alleging facts sufficient to establish the existence of both subjective interest and objective reasonableness, the Court need not dwell on this issue or pursue it in greater detail.

Having fully considered the list of factors recited above, the Court observes that the defendants have not suggested any supplemental factor which they might claim the Court should add to its list of important indicators of reasonableness. The Court finds that, viewing each defendant's submissions separately and all the submissions together, no novel questions are presented requiring consideration of any other facet of the defendants' claims.

After reviewing the totality of each defendant's claim, the Court finds that, with one exception, no defendant has properly alleged the existence of a legally sufficient standing claim. The Court reiterates that the defendants' assertions (with the exception of those made by Ojeda Rios in connection with the Ponce de Leon location) amount to no more than a general claim that some defendants used the locations periodically for illegal purposes with the expectation that no one would discover what they were up to. The defendants' standing claims, with the noted exception of those of defendant Ojeda, must therefore be denied for failure to sufficiently allege an adequate foundation of Fourth Amendment reasonableness.

### 3. Defendant Ojeda's Affidavit

The Court has found that defendant Ojeda's allegations made with regard to the Ponce de Leon location are sufficient on their face to permit him to further pursue his assertion of standing at a hearing. Procedurally, however, Ojeda's standing posture is demonstrably deficient. Having declined the opportunity to further pursue his allegations as required under the Fourth Amendment, the Court finds that his claim must also be denied.

Pursuant to Rule 12(b), issues of standing must be raised prior to trial. Defendant Ojeda timely filed his standing allegations as required by the Court's order of January 30, 1987. Pursuant to Rule 12(c), hearings may be had on pretrial issues, where required. The Court has found that Ojeda's claims are adequate to entitle him to a hearing on the merits in order for him to met his burden of proving the truth of his allegations by a fair preponderance of the evidence. The Court has accordingly asked counsel representing defendant Ojeda on two occasions if he desired to have such a hearing. Counsel has expressly declined to avail himself of this opportunity. *Transcript of Proceedings of May 5, 1987,* pp. 7–8 (remarks of Attorney Kuby representing defendant Filiberto Ojeda Rios by agreement and with the defendant's consent). The defendant instead insists on relying solely on his affidavits and the present record to establish his standing claim. Pursuant to Rule 12(f), the defendant has thereby waived his right to a hearing.[48] This waiver is fatal to his claim.

---

**48.** Rule 12(f) provides in pertinent part:
Failure by a party ... to make requests which must be made prior to trial, at the time set by the Court pursuant to subdividion (c) ... shall constitute waiver thereof, but the court for cause shown may grant relief from the waiver.
Motions to suppress, including allegations of standing, must be submitted prior to trial. Rule 12(b)(3). Furthermore, pursuant to Rule 12(e),

■ Where the Government reasonably contests a defendant's standing to challenge a search or seizure, the defendant is required to prove facts necessary to support his or her professed subjective expectations and the overall reasonableness of his or her position. Although the defendant's affidavits present a superficially colorable claim, the defendant's unsubstantiated allegations, without more, are insufficient, in the face of the Government's reasonable (and vigorous) objection, to satisfy the defendant's burden of proving an adequate foundation on which the Court could properly conclude that the defendant's alleged interests are protected under the Fourth Amendment.[49] In sum, the defendant, in insisting on sole reliance on his affidavits, has declined to embrace and meet his Fourth Amendment responsibilities. His standing must therefore be denied.

The reasonableness of the Government's objection to the defendant's allegations is fairly obvious. Analysis of the defendant's allegations reveal certain serious weaknesses which tend to undermine the legitimacy of his assertion of standing. First, the defendant's allegations are somewhat contradictory and contain significant factual and logical gaps. Second, the record reflects a paucity of facts that fairly support the defendant's claim. And third, the record reflects a wealth of information that seriously undermines the defendant's position. The Court addresses some of the weaknesses of the defendant's claim in detail.

First, the defendant alleges that he possessed a key to the Ponce de Leon premises. He has not, however, produced this key. Furthermore, there is no evidence, other than the defendant's naked allegation, that he actually ever had such key in his possession at any time. The Court is therefore in no position to find that the defendant has in any way met his burden with regard to the alleged possession of a key

Second, defendant Ojeda claims that he maintained the Ponce de Leon premises as an office for the purposes of storing documents that chronicle the struggle of the people of Puerto Rico for independence, and that he personally collected and preserved these documents over the years as an archive. Evidence in the record suggests otherwise: that the organization used the premises as a safehouse and that the documents stored there were not the components of an archive, but documents which the group had gathered in pursuit of violent revolutionary and terrorist activities. The defendant has yet to establish the factual foundation that would support his innocuous characterization and the truth of his allegation. Moreover, the defendant has yet to establish what materials (if any) seized at the location were, in fact, components of the alleged archives and which were not (e.g. the bomb found at the location), and whether the defendant had any responsibility, control, or authority over the latter.

Third, the defendant suggests in his affidavit that his interest in the Ponce de Leon location existed contemporaneously with its search. However, the defendant also states in his affidavit that he believes that the F.B.I. illegally attempted to break into the Ponce de Leon premises several weeks prior to its search on April 3, 1984. *Affidavit*, p. 4. The defendant adds that at the time of the alleged attempted break-in

the Court, in the absence of good cause, must resolve the defendant's standing claim before trial commences. Pursuant to Rule 12(c), the Court has asked the defendant if he wishes to have a hearing on this issue. He has expressly declined the opportunity. The defendant's failure to request a hearing in the face of the Court's offer constitutes a waiver under Rule 12(f). *See United States v. Gomez*, 770 F.2d at 253 (proof of standing is an essential element of any motion to suppress and, thus 1) falls within the purview of Rule 12(b); and 2) is subject to the waiver provisions of Rule 12(f)). If the defendant wishes relief from this waiver, it is up to him to now demonstrate good cause as to why his rejection of the opportunity for a hearing should not be accepted as conclusive.

**49.** The Government has objected to the defendants' standing claim in a timely fashion, and has demanded that each defendant meet his or her burdens of proof. *Government's Consolidated Response to Defendants' Assertions of Standing*, filed March 3, 1987, pp. 4–5.

(which in fact may have been rival macheteros searching for proceeds from the Wells Fargo robbery) he believed that such activity was a part of the F.B.I.'s alleged "long-established pattern of persecution and its repressive and illegal program of counterintelligence...." *Id.* at 4. Having admitted that he believed that the Ponce de Leon location was the subject of F.B.I. persecution and repression as exhibited by the alleged break-in several weeks before the search; and given the Court's earlier findings, with regard to the defendant's bail hearings, that he lived underground and avoided detection, the Court is not persuaded that it should assume that the defendant ever visited the location at issue at any time within the period after which he alleges F.B.I. repression began. *See also Consolidated Memorandum in Support of Motion to Suppress,* filed [on behalf of all defendants and on behalf of defendant Orlando Gonzales Claudio] December 22, 1986, p. 7 ("members of Los Macheteros took great care to avoid surveillance—electronic or visual"); *Supplemental Memorandum of Defendant Jorge Farinacci Garcia,* filed [on behalf of all defendants] December 23, 1986, p. 19 (citing *Affidavit of Special Agent Jose Rodriquez,* dated April 27, 1984, pp. 36–40) ("Los Macheteros trained its members to use counter surveillance techniques to avoid detection when going and coming from 'safehouses,' including the alleged 'safehouse' belonging to Los Macheteros located at [Ponce de Leon]"). If the defendant did not visit the location on a regular basis, or at any time relatively contemporaneous with its search, this fact would seriously undermine his overall claim. *United States v. Garcia,* 741 F.2d at 366. *See Transcript of Proceedings of May 5, 1987,* pp. 153–54 (testimony of Agent Esposito) (testimony that the Government never observed the defendant going to or coming from the Ponce de Leon safehouse).

Fourth, the defendant claims to have made arrangements for leasing, equipping, and furnishing the premises. However, the defendant fails to provide certain essential details that might serve to help substantiate this claim. His naked allegation that he performed these activities, without more, hardly proves the truth of the assertion.

Fifth, the defendant claims to have been the leader of the organization that controlled the Ponce de Leon premises. However, he does not detail his leadership responsibilities or authority. More specifically, he does not explain whether it was his personal responsibility to arrange for the operation of the premises, or whether this responsibility was relegated to someone else.

Sixth, it is unclear whether the defendant claims ownership of any or all of the items seized from the location. The defendant alleges, not that he maintained the archives for himself, but that he collected the materials over the years for the benefit of the independence movement. Indeed, the defendant seeks to have all of the seized materials returned, not to him, but to the Institute of Puerto Rican Culture (National Archives). *Affidvit,* at 4. The defendant further states that his purposes in maintaining the secrecy of the "archives" was not to maintain them as his own personal property, but to prevent their destruction at the hands of the forces of oppression. And finally, the other defendants uniformly claim in various memoranda, in which Ojeda Rios has joined, that the Ponce de Leon location was used as a storage facility for records and materials belonging to the organization as a whole, not personally to any individual member. In the absence of specific allegations of ownership of either the premises or its contents, the Court is not persuaded, under the circumstances, that it should presume that the defendant actually owned or held a proprietary interest in the premises, its contents, or both. Moreover, to the extent the defendant in effect disclaims personal interest in the location's contents (by virtue of the fact that he claims the materials belong to the people of Puerto Rico as part of their patrimony and should be sent to the Institute of Puerto Rican Culture), this seriously undermines any claim that he possessed a significant personal interest in the materials that is distinguishable from an interest any number of other individuals might have with regard to the same items.

The reasonableness of the Government's objection to the defendant's claim is clear. The Government is entitled to insist that the defendant bear his Fourth Amendment burdens. The reasonableness of the defendant's unsubstantiated professed expectations of privacy is far from clear. Since the defendant has declined the opportunity to substantiate his claims, his standing with regard to the Ponce de Leon premises must be denied.

### Conclusion

Each defendant has failed to properly allege or establish the existence of a significant number of the badges of reasonableness courts have traditionally looked to in resolving questions of standing.[50] No defendant has otherwise been able to establish that his or her expectations were at all significantly similar in quality to interests traditionally regarded as entitled to Fourth Amendment protections. In fact, the defendants' allegations establish that their situations, to the extent such are revealed by the defendants' submissions and other relevant information, are similar to those in which courts have specifically denied standing. *See e.g. United States v. Shakur,* 560 F.Supp. at 343–45. The Court is unable to conclude that any defendant has made a legitimate, substantiated claim that any of his Fourth Amendment privacy rights have been violated in any cognizable way. The Court therefore finds that each defendant lacks standing to challenge the searches and seizures at issue in this ruling.

SO ORDERED.

---

**50.** A defendant, of course, need not necessarily allege the existence of all or even substantially all of the factors the Court has alluded to in order to establish a colorable subjective standing claim. The defendants, however, with the exception of defendant Ojeda, have failed to allege the existence of even a significant number of such factors. *See United States v. Garcia,* 741 F.2d at 366 (defendant must establish a significant interest in the location searched); *United States v. Vicknair,* 610 F.2d at 379 (such an interest must derive from a personal rather than a collective interest). *See also United States v. Nabors,* 761 F.2d 465, 468–69 (8th Cir. 1985), *cert. denied,* — U.S. —, 106 S.Ct. 148, 88 L.Ed.2d 123 (1985) (discussing the broad spectrum of factual situations in which standing has been acknowledged or denied). While it is certainly conceivable that a defendant might properly raise factors in his favor not alluded to by the Court, the Court finds that the defendants have failed to do so in this case.